DRAYTON, James, Banner, James

v.

ROBINSON, William B., DeRamus, Erskind, Patton, Ernest, Petsock, George, Bell, Harvey, Palakovich, John, Langland, Harry, Marks, Ronald.

Appeal of William B. ROBINSON, Erskind DeRamus, Ernest Patton, George Petsock, Ronald Marks, Harvey Bell and John Palakovich, in No. 82–3006.

DRAYTON, James, Banner, James

v.

ROBINSON, William B., DeRamus, Erskind, Patton, Ernest, Petsock, George, Bell, Harvey, Palakovich, John, Langland, Harry, Marks, Ronald.

Appeal of William B. ROBINSON, Erskind DeRamus, Ernest Patton, George Petsock, Ronald Marks, Harvey Bell and John Palakovich, in No. 82–3205.

Nos. 82–3006, 82–3205.

United States Court of Appeals, Third Circuit.

Submitted Under Third Circuit Rule 12(6) Sept. 26, 1983.

Decided Oct. 17, 1983.

---

* Honorable Edward D. Re, Chief Judge of the United States Court of International Trade, sit-    ting by designation.

LeRoy S. Zimmerman, Atty. Gen., Francis R. Filipi, Deputy Atty. Gen., Andrew S. Gordon, Deputy Atty. Gen., Harrisburg, Pa., for appellants.

James E. Drayton, pro se.

Before ALDISERT and BECKER, Circuit Judges, and POLLAK, District Judge.*

## OPINION OF THE COURT

ALDISERT, Circuit Judge.

This appeal by Pennsylvania state correctional officials from an adverse jury verdict presents two interrelated questions: whether state regulations give appellee Drayton, a state prison inmate, a protected liberty interest in remaining in the general prison population rather than being placed in segregated confinement; and, if so, whether the actions of the defendants, in placing Drayton in administrative custody, met the requirements of due process? The district court, 519 F.Supp. 545, determined that

* Honorable Louis H. Pollak, United States District Judge for the Eastern District of Pennsylvania, sitting by designation.

Drayton had a protected liberty interest and that defendants' actions deprived him of that interest without due process of law. We conclude that the Supreme Court's intervening decision in *Hewitt v. Helms,* —— U.S. ——, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), requires that we vacate the judgment entered below and remand these proceedings to the district court for reconsideration of its due process determination.

### I.

The disposition of this case turns, in part, on the interpretation and effect of two Pennsylvania Bureau of Correction regulations: "Administrative Directive 801" (Directive) and "Administrative Memorandum—HVA Cases" (Memorandum). We first will analyze those regulations and then address the substance of the present appeal.

### A.

The Directive governs the placement of inmates into Administrative or Disciplinary Custody—progressively more restrictive prison housing situations that involve the transfer of an inmate from the general prison population to either segregated or solitary confinement. We are concerned here with Administrative Custody, the less restrictive form of segregated confinement. Segregation into Administrative Custody is allowed, if the inmate: (1) is suspected of committing a Class 1 Misconduct (i.e., murder, manslaughter, attempted escape, etc.), (2) is under investigative status because the prison officials believe he poses a threat to the internal security of the institution, or (3) requests such confinement.

Here, Drayton was placed into Administrative Custody on the suspicion that he posed a threat to the internal security of the prison. In such circumstances, the Directive provides that prison officials may, "[d]epending on the situation and the need for control," immediately place an inmate in Administrative Custody for up to ten days while they conduct an investigation. However, before the confinement may be continued beyond the ten days a hearing must be held. Accordingly, the Directive

requires that: (1) the inmate receive a hearing conducted by the prison's Hearing Committee; (2) the inmate be given at least 24 hours advance written notice of the hearing and that the hearing be held no later than six days thereafter; (3) if the inmate so chooses, the hearing be quasi-adversarial with the inmate allowed to call witnesses, question the staff, and be represented by "jailhouse" counsel; and (4) the inmate be provided with a written report describing the Hearing Committee's recommendations and the rationale therefore. Further, an adverse decision from the Hearing Committee may be appealed by the inmate to the prison's Program Review Committee.

### B.

By contrast with the Directive, the Memorandum governs the handling of inmates who are being held in the prison at the request of some other authorities. These HVA (Hold for Various Authorities) inmates are usually at the state prison on transfer from other jails, and may be held for a variety of reasons. The Memorandum is considerably less detailed than the Directive and provides only that "HVA cases received as medical transfers shall be placed in the hospital or infirmary. All other HVA cases shall, upon reception, be placed in Administrative Custody pending a formal hearing to determine appropriate housing.... The formal hearing shall be held as prescribed in [the Directive]." It is against the backdrop of these regulations that we examine the facts in this case.

### II.

Appellee Drayton was transferred from the Dauphin County Jail to the State Correctional Institution at Camp Hill on March 27, 1979, while he was awaiting trial for murder. His transfer form indicated that he was being sent to Camp Hill for medical treatment, and that he should "be housed in a maximum security cell [and] ... be considered extremely dangerous." He was immediately placed in the Camp Hill hospital and received a prompt hearing to deter-

mine his "permanent" housing classification. Because his transfer form characterized Drayton as a security problem the Hearing Committee decided to place him in Administrative Custody until such time as he was called for trial. The record does not indicate, nor does the state contend, that Drayton was given either written notice in advance of the hearing or a written explanatory report following the hearing. He stayed in Administrative Custody until he returned to stand trial, on or about April 7, 1979.

Drayton was subsequently convicted of murder and robbery and sent to the Dauphin County Jail prior to sentencing. After causing a disturbance there he was again transferred to Camp Hill on May 30, 1979, "for security reasons." He remained there for about seven months, until December 26, 1979, when he was sent to a New Jersey correctional facility.

Upon his arrival at Camp Hill he was again placed in Administrative Custody. On June 1, 1979, two days after his arrival, a hearing was held, and it was recommended that, because he had caused a disturbance at the Dauphin County Jail, and for "security reasons," Drayton be held in Administrative Custody while at Camp Hill. During his stay, his housing status was reviewed by the Program Review Committee approximately every 30 days and continued Administrative Custody was always recommended.

In October 1979—while still in Administrative Custody—Drayton filed this civil rights action claiming that the defendants violated his constitutional right to due process of law when they placed him in such custody first on March 27, 1979 and again on May 30, 1979. The district court agreed that Drayton's due process rights were violated and, following a jury trial on the issue of damages, awarded him $1.00. The defendants appeal, arguing alternatively that Drayton had no constitutionally protected liberty interest to remain in the general prison population, and if he did, the process he received was all he was due.

### III.

We first address the question of whether Drayton had a protectable liberty interest, to remain in the general prison population, while at Camp Hill prison. It is settled that the language in the Directive, mandating that a hearing be held by the prison authorities either before or shortly after placing an inmate in Administrative Custody, creates such a liberty interest in the inmate, cognizable under the due process clause of the fourteenth amendment. *Hewitt v. Helms,* —— U.S. at ——, 103 S.Ct. at 871. The only issue then is whether the Directive was applicable to Drayton during his two periods of confinement at the Camp Hill prison. Appellants contend that it was not. We disagree.

As to Drayton's first period of confinement, appellants argue that the Directive did not apply because he was an HVA, and not a regular, inmate. They contend that the HVA Memorandum was developed because HVA's were not covered by the Directive and thus, the only state regulation that applied to Drayton was the HVA Memorandum. They continue that the Memorandum alone does not create a liberty interest because it contains no mandatory, substantive standards that the prison authorities must apply before placing an inmate in Administrative Custody. It is the existence of such mandatory procedural standards, in connection with specific substantive criteria, that the Supreme Court in *Hewitt* relied on to conclude that the Directive creates a protected liberty interest. *Id.* Appellants conclude, therefore, that absent the mandatory language, no liberty interest arises. Concerning Drayton's second period of confinement, appellants argue that the Directive was not applicable to him because he had yet to be sentenced. They maintain that there are significant differences between sentenced and unsentenced inmates and that the Directive was intended to apply only to the former. Appellants cite no authority for this argument. We find their contentions to be meritless.

A fair reading of both the Directive and the HVA Memorandum indi-

cates that both are applicable to an HVA inmate. The Directive, promulgated first, is detailed in substance and specific in procedure. The Memorandum, adopted later, is much shorter and less specific, and, in fact, expressly incorporates the hearing procedures of the Directive by reference. They were both adopted by the Bureau of Corrections for use in state prisons and even appellant does not argue that they are not capable of being read in *pari materia.* Nothing in the Directive limits its applicability to sentenced as opposed to unsentenced inmates. By its terms, the Directive applies to *all* inmates, and no one argues that Drayton, whether classified as an HVA prisoner or an unsentenced prisoner, was not an inmate. Also, the purpose of the Directive was to provide prison officials with a means to protect the correctional facility and its residents by controlling inmates with behavior problems. Such problems could just as easily be found in an HVA, an unsentenced, or a regular inmate. Finally, to accept appellants' interpretation of the regulations would create an anomalous situation where inmates who are charged, tried, convicted, and sentenced would, by virtue of the applicability of the Directive, have greater constitutional protection from segregated confinement than inmates who are merely being held awaiting trial, or convicted but unsentenced.

For these reasons, we reject appellants' argument and, in accordance with the Supreme Court's interpretation of the Pennsylvania Bureau of Correction's Directive announced in *Hewitt v. Helms,* affirm the district court's conclusion that Drayton, both as a pre-trial HVA inmate and as a convicted but unsentenced inmate, had a protectable liberty interest in remaining in the general prison population and that any removal therefrom for placement in Administrative Custody could be done only if it conformed to the requirements of due process. We now turn to the due process inquiry.

### IV.

■ The district court concluded that various aspects of Drayton's confinement in Administrative Custody, both from March 27, 1979 to April 7, 1979 and May 30, 1979 to December 26, 1979 violated his due process rights. The court based this conclusion on findings which indicated that, in placing Drayton in Administrative Custody, the prison officials failed to follow the procedural requirements set out in the Directive. Specifically the court found that: (1) Drayton received no written statement explaining the rationale for his segregated confinement during his first period of incarceration; (2) the actual reasons given for initiating his segregated confinement, during both the first and second periods of incarceration, did not conform to the requirements of the Directive; (3) during Drayton's second period of segregated confinement, while there was periodic review by the Program Review Committee, Drayton was never given an adequate, written explanation of why the Program Review Committee continually recommended that he remain in segregated confinement; and (4) there was no evidence that the continual segregated confinement of Drayton during his second period of incarceration was for any of the reasons required by the Directive. Here, appellants argue that if Drayton did have a protected liberty interest, whatever process he received was all that he was due, irrespective of whether it comported with the Directive. The key issue, then, is whether due process requires that the defendants must follow the procedures set forth in the state regulatory schema that creates the subject liberty interest or whether the court must make an independent assessment of what process is due.

In determining that appellants violated Drayton's due process rights, the district court relied heavily on the fact that the specific procedural requirements of the Directive were not followed. There is no indication in its opinion that an independent due process assessment was made. The district court arrived at its conclusion, however, without the advantage of the Supreme Court's latest teaching in *Hewitt v. Helms.*

In *Hewitt,* the Supreme Court gives specific guidance as to what the due process clause requires of prison officials, in terms of hearings and subsequent reviews, when placing an inmate in Administrative Custody under the Pennsylvania Bureau of Corrections' Directive. The Court stated:

> We think an informal, nonadversary evidentiary review [is] sufficient both for the decision that an inmate represents a security threat and the decision to confine an inmate to administrative segregation pending completion of an investigation into misconduct charges against him. An inmate must merely receive some notice of the charges against him and an opportunity to present his views to the prison official charged with deciding whether to transfer him to administrative segregation. Ordinarily a written statement by the inmate will accomplish this purpose, although prison administrators may find it more useful to permit oral presentations in cases where they believe a written statement would be ineffective. So long as this occurs, and the decisionmaker reviews the charges and then-available evidence against the prisoner, the Due Process Clause is satisfied. This informal procedure permits a reasonably accurate assessment of probable cause to believe that misconduct occurred, and the "value [of additional "formalities and safeguards"] would be too slight to justify holding, as a matter of constitutional principle" that they must be adopted, *Gerstein v. Pugh, supra,* 420 U.S. [103], at 122 [95 S.Ct. 854 at 867, 43 L.Ed.2d 54].

—— U.S. at ——, 103 S.Ct. at 874 (footnote omitted).

Whatever had been the state of the law prior to *Hewitt,* the Court there does not require that the detailed procedural schema set out in the Directive must be strictly adhered to in order to satisfy due process. Because *Hewitt* furnishes directions not available to the district court at the time of its due process decision we believe that it is appropriate to permit the district court to reconsider its determination.

V.

Accordingly, we will vacate the judgment of the district court and remand these proceedings for reconsideration of the due process determination in light of *Hewitt v. Helms.*