791 F.2d 1094
 SOURBEER, Gregory S., Appellant in No. 85-5273,
v.
ROBINSON, William, Commissioner of the Bureau of
Corrections, State of PA; Patton, Ernest S., Superintendent
of S.C.I. at Camp Hill; Marks, Ronald Deputy Superintendent
of Security of S.C.I. at Camp Hill; Bell, Harvey, Deputy
Superintendent of Treatment of S.C.I. at Camp Hill; and
Harrison, William, Classification & Treatment Supervisor of
S.C.I. at Camp Hill; Individually and in their official capacity.
Appeal of PATTON, Marks, Bell & Harrison.
 Nos. 85-5237, 85-5273.
 United States Court of Appeals,
Third Circuit.
 Argued Jan. 8, 1986.
Decided May 28, 1986.
Rehearing and Rehearing In Banc Denied
Denied June 19, 1986.
 
 Leroy S. Zimmerman, Atty. Gen., Gregory R. Neuhauser, Deputy Atty. Gen., (argued), Office of Atty. Gen., Litigation Section, Harrisburg, Pa., for Patton, Marks, Bell & Harrison.
 Thomas M. Place (argued), Robert E. Rains, Legal Assistance Program, Carlisle, Pa., for Gregory S. Sourbeer.
 Before WEIS, HIGGINBOTHAM and BECKER, Circuit Judges.
 OPINION OF THE COURT
 A. LEON HIGGINBOTHAM, Jr., Circuit Judge.
 
 
 1
 This is an appeal from a final judgment of the district court in an action brought by a Pennsylvania prisoner, Gregory S. Sourbeer, under 42 U.S.C. Sec. 1983. Ernest S. Patton, Ronald Marks, Harvey Bell, and William Harrison ("the appellant officers") were found liable for $1,970 in damages for violating Sourbeer's due process rights. Sourbeer cross-appeals from the denial of certain other claims. For the reasons that follow, we will affirm in part, reverse in part, and remand for further proceedings.
 
 I.
 
 2
 On October 4, 1976, Sourbeer was convicted, in the Court of Common Pleas of Lancaster County, Pennsylvania, of murdering his mother. Though still unsentenced, he was transferred from the Lancaster County jail to the State Correctional Institution at Camp Hill ("SCI-Camp Hill") on October 13, 1976. At that time he was fifteen years old. The Lancaster County authorities asked to have Sourbeer transferred because they viewed him as a security risk due to his age and the nature of his offense, and because they felt he could receive proper supervision at SCI-Camp Hill.
 
 
 3
 Upon his arrival at SCI-Camp Hill, Sourbeer was classified as an H.V.A. ("Hold for Various Authorities") prisoner because of his unsentenced status. From October 13, 1976 until October 27, 1977, when he was returned to Lancaster County for sentencing, Sourbeer was housed in the Restricted Housing Unit ("R.H.U.") at SCI-Camp Hill in "administrative custody" status. The R.H.U. is a separate wing that houses inmates who are disciplined for misconduct or who are segregated from the general population for administrative reasons. It is the most secure housing area at SCI-Camp Hill.
 
 
 4
 During his confinement in administrative custody, Sourbeer was denied entertainment and recreational privileges, required to eat all his meals in his cell, permitted only one hour of exercise outside his cell per day, Monday through Friday, and denied regular visiting privileges (though, on eight separate occasions, Sourbeer had visits from relatives and attorneys). He was not permitted to attend religious services in the prison chapel, use the prison library, or participate in educational and vocational training programs. Sourbeer was permitted to designate a spiritual advisor who could make unlimited visits, but he did not do so. During his confinement in administrative custody, Sourbeer never received a complete psychological or psychiatric examination, nor was he ever charged with any misconduct.
 
 
 5
 After being sentenced in Lancaster County, Sourbeer was returned to SCI-Camp Hill and, on December 8, 1977, placed in general population. During 1978, while in general population, Sourbeer attended religious services five times.
 
 
 6
 Throughout the period of Sourbeer's confinement in administrative custody, regulations were in effect in Pennsylvania that established procedures and substantive standards governing the use of restrictive housing in state correctional institutions and regional correctional facilities. The Supreme Court of the United States had occasion to consider these regulations in Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), and held that they created a liberty interest in general population status that was protected by the Due Process Clause of the fourteenth amendment. ("[W]e are persuaded that the repeated use of explicitly mandatory language in connection with requiring specific substantive predicates demands a conclusion that the State has created a protected liberty interest." 459 U.S. at 472, 103 S.Ct. at 871.) For convenience, we shall refer to these regulations as Administrative Directive 801.[1]
 
 
 7
 Under the Directive, administrative custody was for prisoners requiring closer supervision or protection than is provided in general population, and for temporary assignment pending further classification. The Directive establishes, for each institution, a Program Review Committee ("P.R.C.") to oversee restrictive housing cases. Appellant officers Bell, Marks, and Harrison were, at one time or another, members of the P.R.C. that reviewed Sourbeer's case. The P.R.C. was required to conduct an in-person interview with each inmate in administrative custody at least once every thirty days. Appellant Patton, as Superintendent of SCI-Camp Hill, was responsible for reviewing the P.R.C.'s decisions.
 
 
 8
 Apart from the Directive, during the period relevant to this case, the Commissioner of Corrections promulgated administrative memoranda establishing policies for H.V.A. prisoners. The policy in effect when Sourbeer arrived at SCI-Camp Hill provided: "Although it may be desirable and necessary to segregate H.V.A. cases, there is no legal requirement to keep H.V.A. cases physically separated, when programmatic considerations warrant housing with sentenced inmates, this is permissible."
 
 
 9
 On January 7, 1977, the Commissioner issued a memorandum revising this policy. It stated:
 
 
 10
 Generally, H.V.A. cases shall be assigned to Administrative Custody. Exceptions are: 1) Medical cases requiring hospital or infirmary placement. 2) Disciplinary cases from the county or as a result of misconduct who require disciplinary custody. The institution shall determine the level of Administrative or Disciplinary custody (close or maximum) based on the individual circumstances on a case by case basis.... H.V.A. cases are excluded from program participation and work assignments. They are limited to the routine activities of the Administrative Custody Unit.
 
 
 11
 On April 7, 1977, a new memorandum on H.V.A. cases was issued. This one stated that such inmates should be initially placed in administrative custody, pending a hearing to be held in accordance with Administrative Directive 801.
 
 
 12
 The district court found that the P.R.C. reviewed Sourbeer's case on October 14, 1976, one day after his placement in the R.H.U. Sourbeer was not present on that occasion, and he was not afforded an in-person interview until November 17, 1976. At that time the P.R.C. gave the following as its reasons for continuing him in administrative custody:
 
 
 13
 Subject is here from the Lancaster County Prison for Administrative reasons. He is awaiting trial on a murder charge. We will continue subject in A.C. as we get to know him and he adjusts to the institution.
 
 
 14
 On December 15, 1976, Sourbeer was again seen by the P.R.C. and continued in administrative custody. The reason given was as follows:
 
 
 15
 Subject is here from Lancaster County & charged with murder. He is in need of close supervision & structure at this time. We will continue him in A.C. & work with him in the hopes he can be placed in general population.
 
 
 16
 Subsequent monthly reviews produced the following statements of reasons for keeping Sourbeer in administrative custody:
 
 
 17
 Subject is a transfer from Lancaster County for security reasons. He remains in A.C. for his own protection. [January 12, 1977]
 
 
 18
 H.V.A. case who has been charged with murder. Due to his status must remain in A.C. status. Currently under hospital care. [February 16, 1977]
 
 
 19
 Mr. Sourbeer was interviewed today. No progress has been made on the litigation or his bail status. [March 16, 1977]
 
 
 20
 Subject is 16 years old & from Lancaster County awaiting trial for murder. He was transferred here from the county for security reasons & his age. Continue in A.C. for his protection & the fact he is unsentenced. [April 13, 1977]
 
 
 21
 Subject is here from Lancaster County & is awaiting trial for murder. Subject is 16 years old & has special programs needs at this time that require an administrative custody setting. [June 8, 1977]
 
 
 22
 Subject is a transfer from Lancaster County for protective custody & is awaiting trial for murder. He will remain in A.C. for programmatic reasons. [July 6, 1977]
 
 
 23
 H.V.A. from Lancaster Co. Murder charge pending. Expects court action in September. Continue on present status due to nature of the case. No problems indicated. Remain in A.C. [August 10, 1977]
 
 
 24
 Subject is an H.V.A. from Lancaster County & awaiting trial for murder. In light of his H.V.A. status & the murder charge his program needs can best be suited in A.C. Other: Security. [September 13, 1977]
 
 
 25
 H.V.A.--from Lancaster County. Murder charge pending. Subject is an H.V.A. from Lancaster County. He has been found guilty of murder & not sentenced. He is awaiting disposition of his appeal. In light of his H.V.A. status & charge his programmatic needs can best be served in A.C. [October 12, 1977]
 
 
 26
 Sourbeer filed a Sec. 1983 complaint on June 14, 1979, alleging, principally, that his confinement in administrative custody violated his rights to due process under the fourteenth amendment (both in the initial placement and the failure to provide meaningful periodic reviews) and to the free exercise of religion under the first amendment. Stipulations of undisputed facts and cross-motions for summary judgment were filed. On April 2, 1984, the district court denied the cross-motions for summary judgment, holding as a matter of law that defendants were not entitled to qualified immunity under Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), and finding that further factual development was necessary to determine the actual basis for Sourbeer's confinement. A bench trial was held on January 22, 1985. Sourbeer testified on his own behalf, and presented an expert psychiatric witness. Appellant officers Marks and Patton testified for the defense, along with their own psychiatric expert.
 
 
 27
 The district court handed down its findings of fact and conclusions of law on March 20, 1985. The court held that Sourbeer's due process rights were not violated by his initial confinement in administrative custody for 35 days prior to any hearing, and that the reviews conducted in November and December of 1976 comported with the requirements of due process. It further held that his confinement between January 7 and April 7, 1977 could not be subjected to due process scrutiny because the H.V.A. policy then in effect did not permit H.V.A. inmates to be placed in general population, thereby vitiating Sourbeer's liberty interest. The court did, however, hold that Sourbeer's due process rights were violated by his confinement during the period from the P.R.C. review on April 13, 1977 until his release from administrative custody on October 27, 1977, because "over time reasons which would have justified Sourbeer's early detention in administrative custody were applied in a rote fashion in later reviews when experience should have led officials to let Sourbeer into the general population." The court awarded Sourbeer $1,970.00 in damages, representing $10 for each day of unlawful confinement.[2] The district court rejected Sourbeer's free exercise claim, finding that his complaint was not credible or sincere.
 
 II.
 
 28
 The appellant officers contend that the district court erred in finding a due process violation and that, in any event, they are entitled to qualified immunity from liability. In his cross-appeal, Sourbeer contends that the district court erred in finding no due process violation in his initial confinement, that he had no liberty interest between January 7 and April 7, 1977, and that his free exercise rights were not violated. He also claims that $10 per day is not adequate compensation for the period of unlawful confinement. In the sections that follow, we shall address each of these contentions.
 
 
 29
 A. The Initial Placement In Administrative Custody
 
 
 30
 Sourbeer was convicted of the first degree murder of his mother on October 4, 1976, and transferred from the Lancaster County jail to SCI-Camp Hill on October 13. The Lancaster authorities viewed him as a security risk because of his age (15) and the nature of his crime. He was classified H.V.A. because of his unsentenced status, and placed in administrative custody. The following day, the P.R.C. reviewed Sourbeer's case and determined that he should remain in administrative custody. Sourbeer was not present at that review. His first in-person review occurred on November 17, 1976, 35 days after being placed in administrative custody. Sourbeer contends that this delay violated the due process requirement that the "proceeding must occur within a reasonable time following an inmate's transfer...." Hewitt v. Helms, 459 U.S. at 476 n. 8, 103 S.Ct. at 874 n. 8.
 
 
 31
 The district court rejected this contention, stating: "Prison officials who had no personal knowledge of an inmate transferred from a county prison after his conviction of murder, could constitutionally segregate that inmate for a period of time in the interest of prison security especially when the transferring county authorities did so because they considered the inmate a security risk who should be placed in maximum security." Sourbeer cannot cite any cases specifically supporting his contention that this was error, noting only that in Hewitt v. Helms, under the rather different circumstances of a prisoner awaiting a disciplinary proceeding, a hearing five days after the placement in administrative custody was deemed timely. This, of course, does not necessarily mean that 35 days is unreasonable in the instant case.
 
 
 32
 Though it is a close question, we think that under the specific circumstances of this case, as noted by the district court, the 35-day wait did not rise to the level of a due process violation.
 
 
 33
 B. Sourbeer's Liberty Interest, January 7 to April 7, 1977
 
 
 34
 The district court did not subject Sourbeer's confinement in administrative custody during the period from January 7 to April 7, 1977 to due process scrutiny because it concluded that a memorandum from Corrections Commissioner Robinson, in effect during this period, effectively extinguished any liberty interest that H.V.A. prisoners had in general population status. We hold that it was error to conclude that Sourbeer had no protectible liberty interest during this period, and accordingly will reverse that part of the district court's judgment, and remand for further consideration of whether Sourbeer was afforded due process during that period.
 
 
 35
 Under Hewitt v. Helms, it is clear that Administrative Directive 801 gave Pennsylvania prisoners a protected liberty interest in general population status. The district court's holding that Sourbeer had no protected liberty interest between January 7 and April 7, 1977, even though Administrative Directive 801 was in effect, was based on the existence of a second "regulation"--really a memorandum from Commissioner of Corrections Robinson dealing with H.V.A. prisoners. It provided that, except in medical or disciplinary cases, H.V.A. prisoners were to be kept in administrative custody, leading the district court to conclude that Sourbeer had no liberty interest in general population status while this memorandum was in effect.
 
 
 36
 The district court's conclusion depends on the validity of one of two premises: (1) Administrative Directive 801 did not, by its own force, create a liberty interest applicable to H.V.A. prisoners, but did so only when buttressed by a separate H.V.A. memorandum to that effect; or (2) the Directive did create such an interest, but could be unilaterally abrogated by memoranda issued by the Commissioner. Neither of those premises is valid. In Drayton v. Robinson, 719 F.2d 1214 (3d Cir.1983) this court had occasion to consider the interrelation of Administrative Directive 801 and the H.V.A. memorandum, and held that the Directive by its terms applies to H.V.A. prisoners, giving them a protectible liberty interest in population status regardless of the contents of the H.V.A. memorandum. 719 F.2d at 1218. Thus, unless the Commissioner of Corrections can take away--by administrative fiat--a liberty interest previously created through duly promulgated, published, and codified regulations, Sourbeer had a protectible liberty interest throughout the period of his segregation. We think it is axiomatic that, except perhaps in exigent circumstances not present here, the Commissioner has no such power.[3] Precise procedures for the promulgation and amendment of all administrative regulations appear at 45 Pa.Stat.Ann. Secs. 1201-1208 (Purdon Supp.1985). They constitute a "rule of recognition," see generally H.L.A. Hart, The Concept of Law 97-107 (1961), for valid regulations. It appears that these procedures were followed by the Commissioner with respect to Administrative Directive 801,[4] but not with respect to the H.V.A. memorandum. Thus, the H.V.A. memorandum cannot be accorded a status under Pennsylvania law superior, or even equal, to that of Administrative Directive 801.[5] We conclude that Sourbeer did have a protected liberty interest during the period January 7 to April 7, 1977. It will be left for the district court to determine whether Sourbeer was deprived of this interest without due process of law.
 
 C. The Due Process Violation
 
 37
 The district court held that Sourbeer's confinement in administrative custody between April 13 and October 27, 1977 violated his due process rights, because, it found, "over time reasons which would have justified Sourbeer's early detention in administrative custody were applied in a rote fashion in later reviews when experience should have led officials to let Sourbeer into the general population." The appellant officers contend that, under the guise of finding a failure to provide due process, the district court has in fact substituted its substantive judgment for the judgment of prison officials. They argue that constitutionally adequate procedures were followed, and that greater judicial deference is due their professional judgment. Though we agree with their assertion that considerable deference must be given to the judgment of prison officials, see Bell v. Wolfish, 441 U.S. 520, 547, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979), we believe that they mischaracterize the district court's holding in this case--the district court did in fact find liability because of a defect in the "process," as opposed to the "substance," of their decisionmaking.
 
 
 38
 There would seem to be no question under Hewitt v. Helms that the informal, monthly review procedures established by Administrative Directive 801 were facially adequate to protect the prisoners' liberty interest in remaining in general population. Nor is there any contention that the appellant officers did not follow the letter of these regulations during the period for which the district court found a due process violation. As we understand the district court's opinion, it found that due process was violated because the monthly reviews, from April 1977 on, were perfunctory, thus denying Sourbeer the most fundamental right of due process: a meaningful opportunity to be heard. See Paratt v. Taylor, 451 U.S. 527, 540, 101 S.Ct. 1908, 1915, 68 L.Ed.2d 420 (1981). We do not share the concern of the appellant officers over the fact that the district court examined the reasons given for Sourbeer's continued confinement in administrative custody. As this court has noted previously, "[t]o insure that periodic review does not become simply a sham, the content and substance of that review must be scrutinized under the illumination of the fourteenth amendment." Mims v. Shapp, 744 F.2d 946, 954 (3d Cir.1984); see also Hewitt v. Helms, 459 U.S. at 477 n. 9, 103 S.Ct. at 874 n. 9.
 
 
 39
 The finding that the purported justifications were simply being applied in a rote fashion should not be disturbed unless clearly erroneous. There appears to be adequate support for this finding. The district court stated:
 
 
 40
 Defendant Marks voiced some concern at trial about plaintiff's withdrawn, standoffish, uncommunicative behavior and "bad attitude," but plaintiff was not issued any misconducts during his stay in administrative custody. In this light, these general observations of Sourbeer's personality cannot justify his segregation. Significantly, while there was some concern about Sourbeer's personality, he was not given any psychiatric or psychological evaluations during his stay at Camp Hill. Finally, and more importantly, Sourbeer's segregated position seems to have resulted simply from his HVA status. Despite the revised HVA memo issued on April 7, 1977, one-half of the periodic reviews from April 24, 1977 onward noted plaintiff's HVA or unsentenced status as a reason for keeping him in administrative custody. Defendant Marks admitted that this was one reason for plaintiff's segregation. Despite the prison officials' stated concern about plaintiff's "programmatic needs," among other things, shortly after Sourbeer was sentenced by the Lancaster County Court he was moved into the general population.
 
 
 41
 App. at 190a (citations omitted).
 
 
 42
 We find it significant that instead of calling as witnesses persons who had professional dealings or day-to-day contact with Sourbeer, only appellants Patton and Marks, who had only limited or indirect contact with Sourbeer and lacked professional training, testified. Had Bell and Harrison, who knew Sourbeer and had training in counseling and psychology, testified, the officers' case might have been more compelling. It is also interesting to note that the P.R.C. reports fairly consistently misstated Sourbeer's status as awaiting trial for murder, when he in fact was convicted but unsentenced. This careless repeated error is additional support for the district court's finding that Sourbeer was not afforded meaningful process.
 
 D. The Free Exercise Claim
 
 43
 Sourbeer contends that his right to freely exercise his religion was abridged during his stay in administrative custody because he was not permitted to attend congregational worship services. The district court rejected this claim on two grounds. First, the district court held that the prohibition against administrative custody inmates attending worship services served a valid security purpose, and was therefore constitutional under St. Claire v. Cuyler, 634 F.2d 109 (3d Cir.), rehearing denied, 643 F.2d 103 (3d Cir.1980).[6] Alternatively, the court found that the free exercise complaint was "not credible or sincere."
 
 
 44
 A sincere religious belief is a prerequisite to any free exercise claim. See Africa v. Commonwealth of Pennsylvania, 662 F.2d 1025, 1030 (3d Cir.1981), cert. denied, 456 U.S. 908, 102 S.Ct. 1756, 72 L.Ed.2d 165 (1982). Unless the district court's finding of insincerity is clearly erroneous, we need go no further. Sourbeer argues that the finding was based on an impermissible inference from the fact that during 1978, while in general population, he attended services only five times. He cites Cole v. Fulcomer, 588 F.Supp. 772 (M.D.Pa.1984), reversed on other grounds sub nom. Cole v. Flick, 758 F.2d 124 (3d Cir.), cert. denied, --- U.S. ----, 106 S.Ct. 253, 88 L.Ed.2d 260 (1985), where the court rejected evidence that a Native American Indian prisoner had not always been religious, and did not observe his religion in every respect, as indicative that his desire to wear his hair at a traditional length was not a sincere religious belief. Though we may agree that courts should not put undue weight on past or unrelated departures from orthodoxy, such is not the case here. The court below relied on evidence relating to the precise practice at issue--attending worship services--during the time period immediately after the restriction at issue was lifted. The court also took note that Sourbeer failed to designate a spiritual adviser who could visit with him in the R.H.U., as he would have been permitted. We cannot say the court's finding was clearly erroneous.
 
 E. Qualified Immunity
 
 45
 The appellant prison officers contend that even if they did violate Sourbeer's due process rights, they are entitled to qualified immunity from liability for damages under the rule of Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982). Harlow held that "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." 457 U.S. at 818, 102 S.Ct. at 2738. In People of Three Mile Island v. NRC, 747 F.2d 139 (3d Cir.1984), this court adopted a broad view of what constitutes an established right of which a reasonable person would have known, "requiring some but not precise factual correspondence [with precedents] and demanding that officials apply general, well developed legal principles." 747 F.2d at 144.
 
 
 46
 The district court found that by the time relevant here, 1976-77, analogous Third Circuit precedents, specifically Gray v. Creamer, 465 F.2d 179 (3d Cir.1972), United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (3d Cir.1973), and Biagiarelli v. Sielaff, 483 F.2d 508 (3d Cir.1973), clearly established that a liberty interest triggering due process rights was involved in administrative custody placements, and that procedural protections comparable to those outlined in Hewitt v. Helms were required. Appellant officers argue that these cases are distinguishable. Thus, we must briefly survey their facts and holdings.
 
 
 47
 Gray v. Creamer was a suit brought by prisoners who had been involved in publication of a prison newsletter that was shut down by prison officials. They alleged, inter alia, that they had been placed in punitive and administrative segregation without being charged with violations of prison regulations or being given a hearing. 465 F.2d at 183. Though the court did not see fit to state on the basis of the record before it precisely what process was due, it did reverse the dismissal of the prisoners' suit, holding "that the transfer of a prisoner from the general population to solitary confinement without either notice of the charges or a hearing does not, absent unusual circumstances not evident in the pleadings, meet minimal due process requirements." 465 F.2d at 185 (footnote omitted).
 
 
 48
 United States ex rel. Tyrrell v. Speaker expanded somewhat on the Gray holding. Tyrrell was classified as a security risk after an escape attempt, and placed in punitive segregation. The court held that such a transfer could be made only after a hearing, on "facts rationally determined." 471 F.2d at 1203.
 
 
 49
 In Biagiarelli v. Sielaff, the plaintiff prisoner was placed in administrative custody after officials received information that he was involved in an escape conspiracy. The court held that he was entitled to "either written notice of the basis for his removal from the prison population and an opportunity to rebut the charge, or a hearing." 483 F.2d at 512. The court declined to state a general rule as to when the notice or hearing would have to be provided, stating that it "depended on when the threat to the institution subsided, regardless of whether he was held in punitive or administrative segregation." Id.
 
 
 50
 The appellant officers attempt to distinguish Gray, Tyrrell, and Biagiarelli on the ground that they did not involve unsentenced inmates such as Sourbeer. They suggest, however, no basis for a reasonable officer to assume that an unsentenced inmate is entitled to less process than sentenced inmates, and we can think of none.[7] If the People of Three Mile Island standard is to have any meaning, insofar as it requires "some" but not "precise" factual correspondence with precedents and that officials apply general legal principles, then it seems to us that Sourbeer's unsentenced status cannot absolve the prison officers from liability.
 
 
 51
 The appellant officers further contend that this early line of cases did not put them on notice of Sourbeer's rights because this court relied on a faulty premise ultimately rejected by the Supreme Court in Hewitt v. Helms--i.e., that the "Due Process Clause implicitly creates an interest in being confined to a general population cell, rather than the more austere and restrictive administrative segregation quarters." 459 U.S. at 466-67, 103 S.Ct. at 868-69. They are correct in pointing out that under Hewitt v. Helms, the source of Sourbeer's liberty interest is not the Constitution itself, but rather is Administrative Directive 801, and that earlier Third Circuit opinions to the contrary therefore had a faulty rationale. We do not, however, believe that this means the appellant officers were not on notice of Sourbeer's liberty interest, and his concomitant right to due process. That right was established in the Gray/Tyrrell/Biagiarelli line of cases and reaffirmed in Hewitt v. Helms. A reasonable official should not fail to respect a person's constitutional rights because the rationale behind the cases establishing those rights may be faulty. Indeed, it is unrealistic to assume that officials are likely even to be aware of the legal reasoning behind applicable precedents. We conclude that Sourbeer's due process rights were clearly established within the meaning of Harlow and People of Three Mile Island, and that the appellant officers are liable to him for damages.[8]
 
 
 52
 The appellant officers raise one other argument on the immunity issue that is worthy of comment. They point out that the district court found that their failure to give Sourbeer adequate process was not intentional, but the result of gross negligence in the conduct of the periodic reviews. They argue that it was not established until Davidson v. O'Lone, 752 F.2d 817 (3d Cir.1984) (in banc), aff'd sub nom. Davidson v. Cannon, --- U.S. ----, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986), that a cause of action lies under the Civil Rights Act for grossly negligent conduct. Thus, they could not reasonably have been expected to know in 1977 that they would be held to such a high standard of care. We need not decide whether this is true,[9] because we believe that the district court's gross negligence finding was superfluous to the resolution of the due process issue.
 
 
 53
 Cases such as Davidson, dealing with a state of mind requirement for Sec. 1983/due process actions, relate only to the highly unusual circumstance where the deprivation of life, liberty, or property the case is predicated upon was not intentional, as opposed to where the failure to provide adequate process was not intentional. For example, in Davidson prison guards negligently failed to take action to protect one prisoner who was threatened by another, allegedly "depriving" him of a liberty interest in being free of assaults. In the case of Parratt v. Taylor, 451 U.S. 527, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), guards negligently lost a prisoner's hobby kit, allegedly "depriving" him of property. In Daniels v. Williams, --- U.S. ----, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986) it was alleged that a correctional deputy had negligently left a pillow on a stairway, causing the plaintiff to slip and thereby "depriving" him of a liberty interest. These cases, it is readily apparent, are of a highly unusual nature--the defendants had probably not even been aware until after the fact of the "deprivations" that would trigger due process concerns. "To hold that injury caused by such conduct is a deprivation within the meaning of the Fourteenth Amendment would trivialize the centuries-old principle of due process of law." Daniels, 106 S.Ct. at 665 (emphasis added).
 
 
 54
 Here, in contrast, the keeping of Sourbeer in administrative custody--depriving him of liberty--was itself an intentional act. That being the case, it was not necessary for the district court to make any other state of mind finding. We know of no authority for the proposition that an intentional deprivation of life, liberty or property does not give rise to a due process violation because the failure to provide due process was without fault. If that were the rule, there would be no due process violation where an official who deliberately deprives a person of his life, liberty or property carefully follows established state procedures that are later found to be constitutionally inadequate, because the official would be without fault.[10] Clearly, that is not the law. See, e.g., Goldberg v. Kelly, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970). Here the defendants deliberately deprived Sourbeer of liberty, and failed to provide process that was constitutionally required--it was unnecessary for the district court to determine whether that failure was intentional, grossly negligent, or without fault at all, because there would be a constitutional violation in any event. Our reading of the district court's opinion leads us to believe that the gross negligence finding was actually inserted only for the purpose of determining whether punitive damages were appropriate, not whether there was a violation of due process in the first instance. The district court's finding of gross negligence, therefore, does not alter our Harlow immunity analysis.
 
 F. The Damages Awarded
 
 55
 Sourbeer contends that $10 per day was insufficient to compensate him for the violation of his rights. He does not seem to contend that it was inadequate as a matter of law, or that it resulted from any clearly erroneous finding of fact. Indeed, he specifically declines to suggest an alternative calculation. We see no basis for disturbing the district court's award.
 
 CONCLUSION
 
 56
 For the reasons set forth above, the judgment of the district court will be reversed insofar as it held that Sourbeer had no protected liberty interest between January 7 and April 7, 1977, and remanded for a determination of whether Sourbeer's due process rights were violated by his confinement in administrative custody during that period. It will be affirmed in all other respects. Costs taxed against appellants in No. 85-5237. Each side to bear its own costs in No. 85-5273.
 
 APPENDIX
 
 57
 Excerpts from Administrative Directive 801 (effective June 1, 1974):
 
 III. PROCEDURES
 
 58
 ....
 
 I. Program Review Committee
 
 59
 1. The Program Review Committee shall be composed of the Deputy Superintendent for Operations, the Deputy Superintendent for Treatment Services and the Director of Treatment. In the absence of one of the foregoing members, the Superintendent shall designate an appropriate substitute.
 
 
 60
 ....
 
 
 61
 4. The Program Review Committee shall review bi-weekly those cases of residents held in Administrative Custody by self-imposed confinement, administrative protective confinement, transfers, etc.
 
 
 62
 Support Teams or counselors (in lieu of Support Teams) shall be responsible for providing the necessary status reports for this Committee to review these cases.
 
 
 63
 5. The Program Review Committee shall interview in persons at least once every 30 days those residents detained in Administrative Custody or the Behavior Adjustment Unit. Residents detained in this status for more than 30 days shall have their cases reported to the Commissioner of Correction, together with the rationale for such status and the particular programs prescribed.
 
 
 64
 ....
 
 V. HOUSING CATEGORIES
 
 65
 The Bureau of Correction shall recognize the following housing categories for residents within state correctional institutions.
 
 
 66
 ....
 
 
 67
 B. Administrative Custody--for residents requiring closer supervision or protection than is provided in the general population and for temporary assignment of residents pending further classification.
 
 VI. CARE AND TREATMENT
 
 68
 A. Administrative Custody housing shall be a specified group of cells in a designated section of a cellblock or infirmary.
 
 
 69
 1. Residents therein shall have all rights and privileges accorded the general population except for curtailment of freedom to move about the institution and engage in programs with the general population.
 
 
 70
 2. They shall retain all personal property with them.
 
 
 71
 3. The Program Review Committee may permit a form of internal work-release from this unit as a gradual process of return to general population status.
 
 
 72
 ....
 
 
 73
 D. .... The Program Review Committee shall release a resident from Administrative Custody or the Behavior Adjustment Unit as soon as feasible.
 
 
 
 Excerpts from Administrative Directive 801 (effective February 12, 1977):
 III. PROCEDURES
 ....
 G. Program Review Committee
 
 
 [1]
 The Program Review Committee shall be composed of the Deputy Superintendent for Operations, the Deputy Superintendent for Treatment Services and the Classification and Treatment Supervisor. In the absence or lack of any of the foregoing members, the Superintendent shall designate an appropriate substitute
 ....
 
 
 [3]
 The Program Review Committee shall review weekly those cases of inmates detained in Administrative Custody or Disciplinary Custody and shall decide whether continued custody in those units is appropriate and necessary in each case. This decision will be based upon a review of the counselor's notes and recommendations, additional entries made on the inmate's record regarding his attitude and actions since placement in the restricted housing or since the last weekly review as well as the misconduct which was the basis of the placement for those cases in Disciplinary Custody
 
 
 [4]
 The Program Review Committee, as a Committee, shall interview in person at least once every thirty days, those inmates detained in Administrative Custody or Disciplinary Custody. The determination of whether continued confinement is warranted will be based upon a review of the counselor's notes and recommendations, psychological and psychiatric reports when available, recommendations by other staff and their written observations regarding his attitude and actions and his attitude and actions during the interview. If the inmate is in Disciplinary Custody, the gravity of the misconduct must also be considered. When the Program Review Committee determines that continued confinement is warranted, the inmate shall be given a written statement of the decision and its rationale. In cases of inmates detained in this status for more than thirty days, it shall be reported to the Commissioner of Correction by the Superintendent with his comments as well as those of the Program Review Committee and the rationale for such status and particular programs prescribed shall be stated. All inmates continuously confined in Administrative and Disciplinary Custody for a period of one year shall be given thorough annual psychological and psychiatric examination during this confinement
 ....
 V. RESTRICTED HOUSING CATEGORIES
 The Bureau of Correction for purposes of this Administrative Directive shall recognize the following restricted housing categories for inmates within state correctional institutions.
 A. Administrative Custody--for inmates requiring closer supervision or protection than is provided in general population and for temporary assignment of inmates pending further classification. Maximum Custody involves housing in the most secure facilities available in the institution and includes the most intensive scrutiny of all matters pertaining to security and the most restrictive regulation of inmate mobility. Close Custody involves housing in more secure facilities than those used for general population and restricted mobility. The degree of security and restriction of mobility is less than the degree present in maximum custody. Maximum or Close Custody may be designated based on the intensity of supervision and control required.
 ....
 VI. CARE AND TREATMENT
 A. Administrative Custody housing shall be designated as Close and Maximum and will be specified groups of cells in a designated section or sections of the institution as the physical plant permits.
 
 
 [1]
 The purpose of placing an inmate in this unit shall be to maintain the safety of the institution by segregating an individual who poses a threat to other inmates, to staff or to himself, poses an escape risk or needs protection from other inmates. The decision to place an inmate in this custody must comply with III. G.4., IV. B.1., IV. B.3., or IV. B.4. Determination of whether Close of Maximum Administrative Custody is necessary will be made by the Program Review Committee
 
 
 [2]
 The inmates therein shall have all the rights and privileges accorded to the general population except for freedom to move about the institution, freedom to engage in programs with the general population, the use of civilian clothing, and the use of items specifically found by the Program Review Committee to be a security hazard. The use of personal radios and televisions may be permitted with the express approval of the Program Review Committee. All other personal property which is permitted in general population will be permitted in Administrative Custody
 
 
 [3]
 The inmate requesting the use of an item or to participate in a program permitted in general population not expressly excluded above shall initiate such a request through the request slip process to the Program Review Committee who shall respond within one week
 
 
 [4]
 The Program Review Committee may permit a limited release program from Close Administrative Custody as a gradual process to return to general population status
 ....
 C. Inmates in categories A and B, above, shall receive interviews at least weekly by the institution's professional treatment staff. The Program Review Committee shall release an inmate from Administrative Custody or Disciplinary Custody as soon as appropriate.
 WEIS, Circuit Judge, dissenting.
 For purposes of analysis, the district court and the majority have divided the plaintiff's confinement in administrative segregation into three periods. The first was from October 13, 1976 to January 7, 1977. Because the initial assignment to segregation was based on security reasons and was intended to give prison officials an opportunity to become familiar with plaintiff, the district court found no liability. The majority affirms, noting that the original confinement "did not rise to the level of a due process violation."
 The second interval began on January 7, 1977, when the Commissioner issued a memorandum purporting to modify prison policy, and continued until April 7, 1977 when another memorandum was distributed. The district court concluded that during this interval the defendants' decision to keep plaintiff in segregation did not infringe his constitutional rights. The majority, however, disagrees and remands for a determination of whether Sourbeer was deprived of a liberty interest without due process.
 The third time span ran from April 7 to October 13, 1977. The district court found that the plaintiff's segregation during that interval resulted in a due process violation. Liability was not based on intentional misconduct but rather on the grossly negligent manner in which the defendants conducted the plaintiff's periodic reviews.
 Although it had made a pretrial finding that defendants were not entitled to qualified immunity based on the record at that point, the district court did not reconsider that ruling in light of the factual findings after trial. Rather, on determining a violation had occurred, the district court simply awarded damages. The majority affirms the damage award on the ground that the district court's finding of perfunctory reviews by defendants was not clearly erroneous.
 The majority and I agree with the district court's determination that the initial placement in administrative custody did not offend the Constitution, and that no damages are due for that period. Because I believe that defendants are entitled to qualified immunity, however I would deny damages for the second and third stages of confinement as well.
 Harlow v. Fitzgerald, 457 U.S. 800, 102 S.Ct. 2727, 73 L.Ed.2d 396 (1982), created a new objective standard for the application of qualified immunity. The purpose of the revised standard is to spare public officials from the expense, both in time and money, in defending against insubstantial damage claims. The shield of immunity applies if the law was unsettled when the conduct occurred. As the Supreme Court phrased it, "If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments." Id. at 818, 102 S.Ct. at 2738.
 If there were any doubt about the standard after Harlow, it was set to rest in Mitchell v. Forsyth, ---- U.S. ----, 105 S.Ct. 2806, 86 L.Ed.2d 411 (1985). The district court was aware of Harlow and cited it in a pretrial memorandum, but Forsyth was decided after the district court entered judgment. In Forsyth, the Court stated that "Hindsight-based reasoning on immunity issues is precisely what Harlow rejected. The decisive factor is not that [the defendant's] position turned out to be incorrect but that the question was open at the time of the act." 105 S.Ct. at 2820. The Court repeatedly emphasized that the law must be "clearly established" and found that the defendants' were entitled to immunity because the legality of a challenged wiretap which had occurred in 1970 was an "open" question at that time. The Supreme Court rejected the district court's conclusion that the Attorney General was liable because "he gambled and lost on the resolution of [that] question."
 Forsyth is significant because it granted immunity to a individual with legal training who had extensive support personnel to assist in a highly professional evaluation of existing law. The position and resources of an Attorney General contrast sharply with those of middle management personnel in a state prison system who are administrators, not lawyers.
 In Davis v. Scherer, 468 U.S. 183, ----, 104 S.Ct. 3012, 3018, 82 L.Ed.2d 139 (1984), the Supreme Court ruled in favor of a qualified immunity claim even though the plaintiff proved that he had been discharged from state employment without constitutionally adequate notice and hearing. The Court stated, "Even defendants who violate constitutional rights enjoy a qualified immunity that protects them from liability for damages unless it is further demonstrated that their conduct was unreasonable under the applicable standard."
 Analysis of whether the rights that plaintiff alleges here were clearly established in 1977 is hampered by the generality of the district court's findings. In its pretrial opinion denying immunity, the court referred to "formal hearings to determine housing categories." In a memorandum denying reconsideration of that ruling, the court relied on Biagiarelli v. Sielaff, 483 F.2d 508 (3d Cir.1973); United States ex rel. Tyrrell v. Speaker, 471 F.2d 1197 (3d Cir.1973); and Gray v. Creamer, 465 F.2d 179 (3d Cir.1972). The court stated, "The clear import of those cases [particularly Tyrrell] is that prison authorities may not act arbitrarily in transferring a prisoner from the general prison population to segregation." The district court believed this restriction was clearly established at the time the challenged acts occurred. However, the initial transfer to administrative custody, the issue which dominated the district court concern at pretrial, is not the problem here.
 The defendants' liability here arises from the plaintiff's right to have "meaningful periodic reviews" after assignment to administrative custody. Plaintiff has not presented persuasive authority to establish that this was a clearly established right, nor to establish a useable definition of "meaningful" in constitutional terms.
 It is undisputed that plaintiff was provided periodic reviews. The district court found that plaintiff was not kept in confinement because of his "bad attitude", but apparently was retained because he was unsentenced. Some of the periodic reports noted that plaintiff was 16 years old and required segregation for his own protection. Monthly periodic reviews, "meaningful" or otherwise, are not necessary to determine whether an inmate has been sentenced or to detect a change in age.
 The majority and the district court would extend by implication the holdings in Biagiarelli, Tyrrell, and Gray to articulate the procedures required for the duration of segregated custody. Even if that reasoning suffices to establish a constitutional violation, it falls far short of the standard required to vitiate immunity. Those three cases did not establish clearly, or otherwise, the standards to be used in conducting periodic reviews or in determining when a prisoner should be released from administrative segregation.
 Biagiarelli and Gray are limited to the initial transfer to administrative custody. They hold that a prisoner must be provided with notice and hearing before being transferred from the general population to segregated confinement. Those cases are inapposite because they do not discuss what process is due after the initial transfer.
 Tyrrell is somewhat closer factually to the case at hand but only to the extent that there the prisoner was unsentenced when he was placed in punitive (not administrative) segregation. Nonetheless the court's opinion focused on the due process requirements for the initial transfer, not events that occurred thereafter.
 Consequently, in 1977 there was a gap in decisional law as to the liberty interests and constitutional rights of unsentenced prisoners during the period of their confinement in administrative segregation. Those issues were not settled until several years after the challenged conduct here occurred. See Hewitt v. Helms, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983); Mims v. Shapp, 744 F.2d 946, 954 (3d Cir.1984); Drayton v. Robinson, 719 F.2d 1214 (3d Cir.1983).
 That the rights of these inmates were in flux in 1977 is apparent from an examination of a state regulation and a memorandum issued by the Commissioner of Corrections. Administrative Directive 801 governs the placement of prisoners in administrative as well as disciplinary custody. A fair reading of that regulation shows that it provided only for the transfer of inmates from the general population to segregation. No provisions spoke to the treatment of unsentenced detainees after they were placed in administrative custody.
 In an effort to interpret 801 and to address the needs of unsentenced prisoners, the Commissioner issued a memorandum in 1977 which purported to establish guidelines for the handling of these special detainees. The memorandum instructed the superintendents and wardens that all unsentenced inmates, except those who required special medical attention, were to be placed in "administrative custody pending a formal hearing to determine appropriate housing." Since the plaintiff's hearing had already taken place, the memorandum did not affect his situation.
 Defendants were subordinates of the Commissioner, and nothing in the record impugns their reliance on the memorandum and regulation for guidance in carrying out their duties. The district court specifically stated that it did not doubt the defendants' sincerity in conducting the periodic reviews and that defendants "did not act with evil motive or intent. There was no intentional misconduct or reckless indifference here."
 In his pretrial memorandum denying immunity, the district judge stated that he did not see "anything in the language of any of those cases [the Gray trilogy] to indicate that the court of appeals intended they be read so narrowly as to eliminate due process" for unsentenced inmates. He continued, "We believe that the cases cited fairly established that some process was due plaintiff and placed defendants on notice of that fact."
 It is critical to the outcome here that the references were only to the initial transfer into administrative segregation. At no point in that memorandum did the district court discuss or articulate due process rights of a prisoner after administrative custody began, let alone determine that they were clearly established.
 Even in the context of initial transfer the language used by the district court indicates error. Harlow has made crystal clear that the correct standard is "clearly established"--not "fairly established" as stated by the district court. There is a substantial difference in the emphasis between "fairly" and "clearly." The former allows some "play in the joints," but the latter is much more demanding.
 In summary, the district court denied immunity based on what was considered established law applicable to initial transfer. After trial, the court determined that the initial transfer was proper but imposed liability on a different basis. That violation, however, was not analyzed to determine if it was in contravention of clearly established law. I am persuaded that test has not been met and that the defendants are entitled to qualified immunity. I would therefore reverse and enter judgment for defendants.
 
 
 [1]
 The regulations, in effect in somewhat varying forms from November 1, 1972 until February 18, 1984, were the product of formal rulemaking procedures under the Commonwealth Documents Law ("CDL"), 45 Pa.Stat.Ann. Secs. 1201-1208 (Purdon Supp.1985) and were codified at 37 Pa.Admin. Code chap. 95. They were disseminated within the Bureau of Corrections in the form of Administrative Directive 801, which differed from the codified regulations only in the manner sections and subsections were numbered. The relevant provisions of Administrative Directive 801 during the period of Sourbeer's confinement appear as an appendix to this opinion
 
 
 [2]
 Commissioner of Corrections Robinson was found not liable because, the district court held, he performed no actionable conduct. Sourbeer does not dispute this finding in this appeal
 
 
 [3]
 We recognize that the Commissioner might simply have viewed his memorandum as a permissible interpretation of Administrative Directive 801. Under our decision in Drayton, however, it is clear that his interpretation was invalid
 
 
 [4]
 The initial publication of the Directive was accompanied by a recitation of steps taken in compliance with the CDL. See 2 Pa.Admin.Bull. 1771 (1972)
 
 
 [5]
 The appellant officers have cited former 71 Pa.Stat.Ann. Sec. 306 (repealed 1984) as a fount of authority for the H.V.A. memoranda. That provision authorized the Commissioner, "[s]ubject to the approval of the Department of Justice, to make such by-laws, rules and regulations for the management of the institution." We need not decide here to what extent this permits the Commissioner to exercise rulemaking authority through procedures other than those prescribed by the CDL, cf. Lowery v. Cuyler, 521 F.Supp. 430 (E.D.Pa.1981), for here we deal only with the problem of priority where the Commissioner's informal memoranda conflict with published regulations
 
 
 [6]
 Subsequent to the district court's decision, St. Claire was overruled by Shabazz v. O'Lone, 782 F.2d 416 (3d Cir.1986) (in banc), which announced a new standard for evaluating prisoners' free exercise claims. Because we affirm on the alternative ground, we need not consider the effect of Shabazz on this case
 
 
 [7]
 It might be argued that because officials are likely to know less about unsentenced inmates than sentenced inmates, a valid distinction may be drawn. Even assuming this is so (and, indeed, we have implicitly recognized such a distinction in allowing 35 days before Sourbeer's first opportunity to be heard), it would not hold true indefinitely. The appellant prison officers had ample opportunity to become acquainted with Sourbeer, had they sought to do so
 
 
 [8]
 The dissent argues that prior Third Circuit precedents are distinguishable because they only dealt with initial placements in restrictive housing, not subsequent renewals of such placements. This distinction, which was not proffered by any party, does not suffice to immunize the appellant officers under the People of Three Mile Island test. We see no basis for a reasonable prison officer applying general legal principles to conclude that less process is due to prisoner facing a second or third "term" in restrictive housing than is due upon initial placement. We also think it is clear, contrary to the dissent's suggestion, that the appellant officers' lack of legal training and reliance on the views of the Commissioner do not make them immune from liability. See Malley v. Briggs, --- U.S. ---, 106 S.Ct. 1092, 89 L.Ed.2d 271 (1986) (police officer who lacks objectively reasonable basis for applying for arrest warrant liable despite magistrate's approval of application)
 
 
 [9]
 Indeed, even in Davidson the reference to gross negligence was dicta (the case involved negligence) and was not joined by a majority of the court. 752 F.2d at 828 & 828 n. 8
 
 
 [10]
 In such a situation the officer may be entitled to Harlow immunity, based on the objective reasonableness of the conduct, but that does not mean there is no due process violation in the first instance