Anthony GETCH, Plaintiff,

v.

Simon ROSENBACH, et al., Defendants.

Civ. A. No. 85–2680.

United States District Court,
D. New Jersey.

Dec. 5, 1988.

As Amended Dec. 29, 1988.

Patricia B. Santelle, Pitney, Hardin, Kipp & Szuch, Morristown, N.J., pro bono, for plaintiff.

Stuart J. Lieberman, Office of the Atty. Gen., Trenton, N.J., for defendant Rafferty.

## OPINION

WOLIN, District Judge.

Plaintiff Anthony Getch, an inmate at Rahway State Prison, has brought this action under 42 U.S.C. § 1983 for the alleged violation of his constitutional rights by defendants Simon Rosenbach, an assistant county prosecutor, and John J. Rafferty, the superintendent of Rahway State Prison.[1] Plaintiff asserts a cause of action against both defendants based on his continued confinement at Rahway State Prison for almost ten months after his original conviction was overturned and while he was awaiting a second trial; plaintiff alleges that defendants should have transferred him to county jail during this period. In addition, plaintiff asserts a cause of action solely against defendant Rafferty for the latter's failure to prevent injury to plaintiff

---

1. Getch also named as defendants his court-appointed public defender and the judge who presided over his trial in state court. Both of these defendants were dismissed from the case by Judge Sarokin in an earlier opinion; slip op. at 3–5 (May 19, 1986); *see infra* note 26.

caused by fellow inmates. Getch also asserts a cause of action against Rafferty for Getch's placement in "solitary confinement" allegedly without charge. Finally, Getch alleges that Rafferty is liable to him for a pattern and practice of willful neglect.

Defendant Rafferty now moves for summary judgment on all four counts of the complaint. For the reasons that follow, the Court grants Rafferty's motion in its entirety.[2]

## INTRODUCTION

Based on a plea of guilty, plaintiff Getch was convicted of robbery by the Superior Court of New Jersey, Law Division, Middlesex County. After an unsuccessful attempt to withdraw the plea, Getch was sentenced on June 13, 1983, to Rahway State Prison for a term of twelve years. He began serving his sentence on that date. On July 27, 1984, the Appellate Division of the New Jersey Superior Court vacated Getch's conviction and sentence, and ordered a trial or the acceptance of another plea.[3] The Appellate Division's order, however, contained no provision specifying the appropriate place of Getch's confinement pending trial in the event that he was ineligible for or unable to post bail. Defendant Rafferty did not receive a copy of the Appellate Division's order.[4]

Following the reversal of his conviction, Getch was unable to post bail. However, he made several efforts to secure his transfer back to the Middlesex County Jail. He alleges that he informed a sergeant and more than one lieutenant of the reversal of his conviction, although he cannot recall their names. Deposition of Anthony Getch, June 30, 1987, at 9–10 [hereinafter Getch Deposition I]. He recalls that he contacted Michael Iaria, his appointed public defender, sometime in August 1984 and expressed his desire to be transferred to the County Jail. *Id.* He recalls that sometime in 1984 he wrote to Superior Court Judge Nicola, the judge who sentenced him, to inform him of his attorney's lack of attention to Getch's case. *Id.* at 11. He further recalls seeking the assistance of prisoners who worked in the prison law library, who, in turn, contacted the East Orange Public Defender's office, the State Police, the Middlesex County Prosecutor's office, and ultimately the Newark *Star–Ledger. Id.* at 11–12. What Getch specifically recalls not doing is utilizing any official prison grievance procedures. *Id.* at 12–13. He believes other inmates contacted defendant Rafferty on his behalf, and claims that he wrote Rafferty himself, *id.* at 13, but his attorney has been unable to produce through discovery any evidence of this.

At his own request, Getch met with Senior Classification Officer Lydell Sherrer on March 1, 1985 and informed Sherrer of his predicament.[5] Immediately after the meeting, Sherrer proceeded to the office of defendant Rafferty and informed him for the first time of Getch's situation.[6] That same day Rafferty sent a letter to defendant Rosenbach, an assistant Middlesex County Prosecutor, in search of assistance in securing a court order to transfer Getch from

---

**2.** By a separate Opinion and Order issued today, the Court, on sua sponte reconsideration of its denial of defendant Rosenbach's motion for summary judgment, grants Rosenbach's motion for summary judgment as well.

**3.** The Appellate Division reversed on the ground that the trial court had abused its discretion in refusing to allow Getch to retract his guilty plea before sentencing.

**4.** Affidavit of John J. Rafferty, June 26, 1987 [hereinafter Rafferty Affidavit] ¶ 3. Since the events in the instant case, the Appellate Division has established a practice of sending prison officials a copy of all orders reversing convictions and sentences. Importantly, however, no such practice was in place during the times relevant herein. Certification of Lydell Sherrer, June 23, 1988 [hereinafter Sherrer Certification II] ¶ 7.

**5.** According to Sherrer, this was when he first became aware of Getch's predicament. Sherrer Certification II, *supra,* ¶ 2. Getch alleges that Sherrer was present at an October 1984 classification meeting at which Getch purportedly told those present that his conviction had been reversed. *See* Affidavit of Anthony Getch, August 15, 1988 [hereinafter Getch Affidavit] ¶ 6.

**6.** Sherrer Certification II, *supra,* ¶ 4; Rafferty Affidavit, *supra,* ¶ 4.

Rahway State Prison to the County Jail.[7] The policy of the Department of Corrections was not to release any prisoner upon an unverified copy of a judicial opinion and absent a court order. The rationale behind this policy is that while the Appellate Division could vacate one order of conviction, it has no way of knowing whether there are any other charges on which an inmate is being held. Thus Rafferty sought and awaited the order of the sentencing judge, who was in a better position to determine whether Getch should be released or transferred to a different institution. In order to procure such an order, Rafferty followed the usual Rahway practice of contacting the prosecutor's office, rather than the inmate's attorney, since the latter presumably already knew of the reversal of the inmate's conviction.[8] Notably, there are no Corrections Department regulations nor any New Jersey Court Rules prescribing the appropriate course of action in cases such as the instant one.[9]

On March 14, 1985, having still received no order authorizing Getch's release, Rafferty directed Senior Classification Officer Sherrer to seek further assistance from an executive assistant within the Department of Corrections.[10] On March 22, the Department responded with a recommendation that Rafferty contact the Clerk of the Appellate Division to obtain official notification of that court's decision and to procure an order authorizing Getch's release.[11] Twelve days later, on April 3, 1985, Rafferty wrote to the Clerk seeking a verified copy of the opinion and an order.[12] The next day Getch's new attorney, Gary M. Weiss, filed a motion in the Middlesex County Superior Court seeking Getch's transfer from Rahway to the Middlesex County Jail pending trial.[13] Weiss made the formal motion to Judge Nicola after denial of an oral request made before Superior Court Judge Deegan at a pretrial conference. After considering this motion, Judge Nicola on May 1, 1985 signed the order authorizing Getch's transfer from Rahway to Middlesex County Jail. Rafferty did not receive a copy of the order until May 14.[14] That same day Getch was transferred back to Middlesex County Jail.

In the meantime, as already noted, Getch's fellow prisoners had notified the *Star–Ledger* of Getch's situation. Following an interview with Getch at the prison, the *Star–Ledger* published an article entitled "Man Still in Prison After Conviction Reversed" in its March 10, 1985 edition. Shortly thereafter, on March 17, 1985, Getch and a fellow inmate, Kevin Coker, were involved in a fight, by virtue of which Getch claims that he was injured. Getch alleges that he was assaulted by Coker and that this assault was a direct result of the publicity caused by the newspaper article; knowing of Getch's imminent release, Coker allegedly viewed Getch as "fair game" for a robbery with impunity.[15] Getch alleges that Rafferty violated his duty of care to Getch in failing to protect him from Coker.

Rafferty has countered that Getch is the one who started the fight and that the fight had nothing at all to do with the *Star–Ledger* article. Furthermore, Rafferty contends that, even if the article was the cause of the fight, he had no way of knowing that the article posed a threat to Getch.

Immediately following the fight with Coker, Getch was placed in closed custody confinement for two reasons: for prehearing detention on disciplinary charges related to the incident; and for protective purposes to protect him from Coker and other inmates known as "Coker's boys." On

7. Defendant's Memorandum of Law, Exhibit H.

8. Sherrer Certification II, *supra*, ¶¶ 4–6. Since the events herein, Rahway prison officials have adopted the practice of contacting the inmate's own attorney rather than the prosecutor in cases such as this. *Id.* ¶ 7.

9. *Id.* ¶ 7.

10. Defendant's Memorandum of Law, Exhibit I.

11. *Id.* Exhibit J.

12. *Id.* Exhibit K.

13. *Id.* Exhibit L.

14. *Id.* Exhibit M; Rafferty Affidavit, *supra*, ¶¶ 8–9.

15. Getch Affidavit, *supra*, ¶¶ 9–10.

March 20, 1985, three days after the incident, Getch was given a hearing on the disciplinary charges. He was found to have violated the disciplinary rule prohibiting inmate fighting and was given 10 days lockup time, with credit for time already served. After the 10 days elapsed on March 27, and until his release from the prison on May 14, 1985, Getch remained in administrative custody for protective purposes.

After his transfer from Rahway and following his trial and conviction on the robbery charges, Getch was returned to Rahway State Prison on September 16, 1985. He was again placed in closed custody confinement and held there until October 29, 1985, at which time he was released into the general prison population. Getch alleges that Rafferty acted intentionally and maliciously in so confining Getch during that period. Rafferty counters that closed custody confinement was necessary for protective purposes until prison officials could determine whether the threat to Getch's safety that existed before May 14, 1985 was still extant.

## DISCUSSION

Getch's cause of action against Rafferty is based on 42 U.S.C. § 1983. That statute provides in part:

> Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State ..., subjects, or causes to be subjected, any citizen of the United States ... to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.

In all four counts of his amended complaint, Getch alleges that the "rights, privileges, or immunities" of which he was deprived are those created by the Fourteenth Amendment, which provides in part that

"[n]o State shall ... deprive any person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV § 1. He also alleges a deprivation of his Eighth Amendment rights to be free from cruel and unusual punishment.

### I. *Getch's Continued Confinement at Rahway State Prison*

In the first count of his amended complaint, Getch alleges that Rafferty violated his liberty interests without due process of law when Rafferty continued to confine Getch at Rahway State Prison for eight and one-half months after Getch's original conviction was overturned. In order to prevail in this argument, Getch must first establish the existence of a valid liberty interest in not being incarcerated at the state prison.

The liberty interests protected by the Fourteenth Amendment arise from two sources: the Due Process Clause itself and the laws of the States. *Hewitt v. Helms,* 459 U.S. 460, 466, 103 S.Ct. 864, 868–69, 74 L.Ed.2d 675 (1983). It is well established that a convicted inmate has no liberty interest under the Due Process Clause in being incarcerated at any particular institution. *Meachum v. Fano,* 427 U.S. 215, 225, 96 S.Ct. 2532, 2538, 49 L.Ed.2d 451 (1976); *Gibson v. Lynch,* 652 F.2d 348, 354 (3d Cir.1981); *Dozier v. Hilton,* 507 F.Supp. 1299, 1306 (D.N.J.1981). After his original conviction was overturned, Getch acquired the status of a pretrial detainee. To the Court's knowledge, no case has yet decided whether a pretrial detainee has any such right arising from the Due Process Clause.[16] However, in opposition to the instant motion, and to a recent motion by defendant Rosenbach,[17] Getch has made no argument that he had a liberty interest arising directly under the Due Process Clause itself. The Court interprets Getch's silence in this regard as a concession that he had no such interest.[18]

---

**16.** *Cf. Maddox v. Thomas,* 671 F.2d 949, 950 (5th Cir.1982) (holding that a convict awaiting sentencing has no such right arising from the Due Process Clause).

**17.** *See supra* note 2.

**18.** Nevertheless, the Court notes that any such argument would be evaluated under the standards laid out in *Bell v. Wolfish,* 441 U.S. 520, 535, 99 S.Ct. 1861, 1871, 60 L.Ed.2d 447 (1979), which held that pretrial detainees have a liberty interest in not being subjected to conditions that

What Getch does allege is that he had a liberty interest based on Executive Order 106 issued by the Governor of New Jersey. In a prior opinion in this action,[19] Judge Sarokin ruled that Getch had such a liberty interest based on the Executive Order. Because this Court is not bound by that determination, the Court will reexamine the issue of whether the Executive Order created a liberty interest in plaintiff Getch.

(A) *Whether Pretrial Detainees in General Have a Liberty Interest Under Executive Order 106*

Executive Order 106 is a temporary emergency order that was enacted by the Governor in 1981 in response to severe overcrowding in state prisons.[20] The Governor found that a state of emergency existed as a result of the overcrowding, and that "these unusual conditions endanger the safety, welfare and resources of the residents of this State, and threaten loss to and destruction of property." Suspending the operation of N.J.S.A. 2C:43-10(e),[21] the Governor invoked his emergency powers under the New Jersey Disaster Control Act, N.J.S.A. App. A:9-30 *et seq.*, and vested in the Commissioner of the Department of Corrections the authority to allocate the place of confinement of prisoners. The Order provides in part:

3. I hereby DIRECT that the authority to designate the place of confinement of all inmates confined in all State and/or County penal or correctional insti-

tutions shall be exercised ... by the designee of the Governor.

4. I hereby designate the Commissioner of the Department of Corrections to effectuate the provisions of this Order.

5. The Commissioner may designate as a place of confinement any available, suitable, and appropriate institution or facility, whether owned by the State [or] a County, ... for the confinement of inmates confined in the State and/or County penal or correctional institutions.

\* \* \* \* \* \*

8. I further ORDER that the authority of the Commissioner to designate the place of confinement of any inmate may be exercised when deemed appropriate by the Commissioner regardless of whether said inmate has been sentenced or is being held in pretrial detention, except that only persons sentenced to a prison or committed to the custody of the Commissioner may be confined in a State Prison.

Plaintiff alleges that Paragraph 8 of the Order created a liberty interest in him in providing that "only persons sentenced to a prison or committed to the custody of the Commissioner may be confined in a State Prison."

In order to determine whether a state statute, regulation or executive order creates a liberty interest, the Court must examine the language in question to determine whether it limits an official's discretion to act under certain circumstances.

amount to punishment. *See also Block v. Rutherford,* 468 U.S. 576, 583, 104 S.Ct. 3227, 3231, 82 L.Ed.2d 438 (1984); *Union County Jail Inmates v. Di Buono,* 713 F.2d 984, 991-97 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984). Not only has Getch failed to raise such an argument, but he has also failed to establish or even allege that the conditions in Rahway State Prison amounted to punishment. *Cf. Inmates of the Suffolk County Jail v. Eisenstadt,* 494 F.2d 1196, 1197 (1st Cir.), *cert. denied,* 419 U.S. 977, 95 S.Ct. 239, 42 L.Ed.2d 189 (1974).

**19.** Slip op. at 8 (May 19, 1986).

**20.** The Executive Order was originally enacted on June 19, 1981 and expired by its terms within 90 days. Its provisions were extended, however, several times by two different Governors

with the result that the provisions were in effect throughout the period at issue in this case.

The Order was upheld as constitutional by the New Jersey Supreme Court in *Worthington v. Fauver,* 88 N.J. 183, 440 A.2d 1128 (1982), *aff'g* 180 N.J.Super. 368, 434 A.2d 1134 (App.Div. 1981).

**21.** Under this statute and N.J.S.A. 30:4-6, persons convicted and sentenced to terms of one year or more are required to be confined in a state prison. N.J.S.A. 2C:43-10(e); *see Cryan v. Klein,* 148 N.J.Super. 27, 31-32, 371 A.2d 812, 814 (App.Div.1977) (construing N.J.S.A. 2A:164-18, the forerunner of N.J.S.A. 2C:43-10), *certif'n granted,* 75 N.J. 606, 384 A.2d 836, *appeal dismissed,* 87 N.J. 304, 434 A.2d 61 (1978).

The Supreme Court has held that "the repeated use of explicitly mandatory language" in a statute to limit an official's actions gives rise to a liberty interest. *Hewitt*, 459 U.S. at 472, 103 S.Ct. at 871. Executive Order 106 provides that the Commissioner of the Department of Corrections may designate the place of confinement of pretrial detainees, but then goes on to provide that "only persons sentenced to a prison or committed to the custody of the Commissioner may be confined in a State Prison." There is little doubt that the Governor had in mind the safety of inmates, as well as that of the public, in enacting the Executive Order. Although overcrowding was prevalent in both state and county institutions, there is some evidence that the state prisons presented a slightly greater threat of violence because of the larger number of inmates at state institutions.[22] In providing that pretrial detainees were not to be confined in state prisons, the Executive Order therefore arguably gave pretrial detainees a liberty interest in not being subjected to the potentially more violent atmosphere in a state prison.

### (B) *Whether Getch Had a Liberty Interest Under the Executive Order*

Getch, however, was not a pretrial detainee at the time he was sent to Rahway State Prison. Rather, he was a duly convicted and sentenced prisoner. The Executive Order provides that "only persons sentenced to a prison or committed to the custody of the Commissioner may be confined in a State Prison." *Id.* ¶ 8. It is undisputed that Getch had been "sentenced to a prison" and "committed to the custody of the Commissioner" at least until July 27, 1984, the day the Appellate Division of the New Jersey Superior Court issued an opinion reversing Getch's conviction and sentence. Following that opinion Getch reverted to the status of a pretrial detainee since he was unable to post bail. Importantly, however, it is undisputed that the Appellate Division did not, simultaneously with its opinion, issue an order vacating the

order of the trial judge that committed Getch to the custody of the Commissioner of the Department of Corrections. Furthermore, at no time prior to Judge Nicola's May 1, 1985 order (not received by Rafferty until May 14, 1985) did any court of competent jurisdiction vacate or dissolve the order that had committed Getch to the Commissioner's custody. Thus Getch remained "committed to the custody of the Commissioner" throughout the period in question.

 It is significant that the Governor, in limiting the Commissioner's authority under Executive Order 106, did not order that "pretrial detainees may not be confined in a State Prison." Rather, he ordered that "only persons sentenced to a prison or committed to the custody of the Commissioner may be confined in a State Prison." The first clause of ¶ 8 deals with pretrial detainees; the second deals with those not sentenced to a prison or committed to the custody of the Commissioner. The two groups are not complementary nor mutually exclusive sets comprising the whole of New Jersey's jail and prison population. Rather, some inmates fall into neither group: for example, a person who has been convicted of a minor crime and sentenced to a county jail. Some inmates fall into both groups: for example, as Getch's case illustrates, a person whose prior conviction has been reversed but who remains committed to the custody of the Commissioner pending retrial. No explanatory comment accompanied the Order, so it is unclear whether this difference in wording was intentional or fortuitous. However, it is more likely than not that the language employed was intentional. To the extent that the Order was intended to protect pretrial detainees from the arguably more crowded conditions of the state prison system, it sensibly sought to keep them out of the system in the first instance. It is not obvious that the Order sought to expel a person from the state system if for some reason he became a pretrial detainee while

---

**22.** *Worthington*, 88 N.J. at 205, 440 A.2d at 1139.

he was there.[23] Indeed, once in the state prison system, an inmate who became a pretrial detainee could continue to take advantage of the superior educational and recreational facilities there. As already noted, the wording of a statute must be explicitly mandatory to give rise to a liberty interest. With respect to inmates who acquire the status of pretrial detainee while incarcerated in a state prison, the Order is not explicitly mandatory in proscribing their confinement in a state prison. Rather, the Order is susceptible to differing interpretations. Thus, Getch has failed to meet his burden of showing that he had a liberty interest under the Executive Order. *See Stephany v. Wagner*, 835 F.2d 497, 500–02 (3d Cir.1987), *cert. denied*, — U.S. ——, 108 S.Ct. 2851, 101 L.Ed.2d 888 (1988).[24]

(C) *Whether a Prison Superintendent Could Have Violated Any Liberty Interest Created by the Executive Order*

▉ Even if Getch had such a liberty interest, this Court determines as a matter of law that defendant Rafferty could not have violated any such interest since he had no duty or power under the Executive Order to effectuate Getch's transfer from Rahway State Prison to a county-operated facility. The powers invoked by the Governor in enacting Executive Order 106 were vested exclusively in the Commissioner of the Department of Corrections. *See* Exec. Order No. 106, ¶ 4. The proscription that Getch claims gave him a liberty interest applied only to limit the Commissioner of the Department of Corrections in the exercise of his otherwise plenary powers. *See id.* ¶ 8. Thus it was the Commissioner, if anyone at all, who owed Getch a duty to transfer him to a county jail. The Order conferred no duties on a prison superintendent such as defendant Rafferty other than a broad duty "to cooperate in all mat-

ters concerning this emergency." *See id.* ¶ 11. The Court determines as a matter of law that a superintendent's duty to "cooperate" encompassed only a duty to *accept* prisoners sent to his prison by the Commissioner; it did not include a duty to *reject* prisoners or to notify the Commissioner that a particular inmate should be housed in another facility. In reaching this conclusion, the Court notes that the type of behavior the "cooperation" clause was designed to prevent was the refusal by wardens of county-operated institutions to accept prisoners of the State or the refusal by superintendents of state prisons to accept convicts sentenced to a county jail. *See Union County Jail Inmates*, 713 F.2d at 987 (where county alleged that Commissioner's refusal to accept state prisoners within 15 days of sentencing pursuant to N.J.S.A. 2C:43–10(e) was unconstitutional); *Worthington*, 88 N.J. at 190 & n. 4, 440 A.2d at 1131 & n. 4 (same); *Cryan v. Klein*, 148 N.J.Super. 27, 29, 371 A.2d 812, 813 (App.Div.1977) (same, before issuance of Executive Order 106), *certif'n granted*, 75 N.J. 606, 384 A.2d 836, *appeal dismissed*, 87 N.J. 304, 434 A.2d 61 (1978). In light of the prison overcrowding, it is chimerical to contend that the Governor was concerned that a superintendent of a state prison would wrongfully maintain custody over one single inmate more than the law required.

Nor can support be found elsewhere for any putative duty on the part of Rafferty to release Getch without a writ or court order or to initiate transfer proceedings. New Jersey law provides that defendant Rafferty, as the chief executive officer of Rahway State Prison, "*shall receive* from the hands of the sheriff or other proper officer every person sentenced to imprisonment in his institution *and safely keep him therein ... until lawfully discharged therefrom.*" N.J.S.A. 30:4–6 (emphasis added). There is nothing in any of the

**23.** Cf. *Worthington*, 88 N.J. at 205, 440 A.2d at 1139 ("Until permanent quarters can be found for [certain] state inmates, it makes sense to confine them in the county jails where they are already incarcerated.").

**24.** *See also State v. Rosenberg*, 78 N.J.Super. 400, 402, 188 A.2d 635, 636 (App.Div.1963) (holding that N.J.S.A. 2A:164–18, the forerunner of N.J.S.A. 2C:43–10, did not create a liberty interest in an inmate).

statutes defining Rafferty's duties, *see* N.J. S.A. 30:4–5; *id.* 30:4–6, nor in his official job description,[25] that indicates a duty on his part to release, in the absence of a writ or court order, persons committed to his custody.[26]

### (D) *The Requisite State of Mind*

■ Although the Court has held that Rafferty could not have violated any liberty interest of Getch's, the Court will nevertheless examine the issue of whether any such violation could have satisfied the state-of-mind requirement. Section 1983 contains no particular state-of-mind requirement. *Parratt v. Taylor,* 451 U.S. 527, 534–35, 101 S.Ct. 1908, 1912, 68 L.Ed. 2d 420 (1981). The requisite state of mind in a § 1983 action is therefore the state of mind required by the statute or constitutional provision giving rise to the underlying rights allegedly violated. *Daniels v. Williams,* 474 U.S. 327, 329–30, 106 S.Ct. 662, 664, 88 L.Ed.2d 662 (1986).

■ Getch claims that his Fourteenth Amendment liberty interests were violated without due process of law. The Supreme Court has held that only intentional conduct can amount to a "deprivation" of life, liberty or property and thus violate the Fourteenth Amendment if due process is not provided; mere negligence is not enough. *Daniels,* 474 U.S. at 330–31, 106 S.Ct. at 665–66; *Davidson v. Cannon,* 474 U.S. 344, 347, 106 S.Ct. 668, 670–71, 88 L.Ed.2d 677 (1986). Getch alleges that Rafferty acted with gross negligence and reckless indifference to Getch's rights. The Supreme Court has specifically declined to determine whether a defendant with an intermediate state of mind, such as

is alleged here, can violate the Due Process Clause. *Daniels,* 474 U.S. at 334 n. 3, 106 S.Ct. at 667 n. 3. Within the Third Circuit however, the issue has apparently been resolved by the lower court opinion in the *Davidson* case itself. *Davidson v. O'Lone,* 752 F.2d 817 (3d Cir.1984) (en banc), *aff'd sub nom. Davidson v. Cannon,* 474 U.S. 344, 106 S.Ct. 668, 88 L.Ed.2d 677 (1986). In *Davidson,* the Third Circuit sitting en banc stated, albeit in dicta, that gross negligence or reckless indifference can amount to a "deprivation" of a liberty interest protected by the Due Process Clause and thus give rise to liability under 42 U.S.C. § 1983. *Id.* at 828.[27] Although this statement was merely dicta, this Court feels especially constrained by it since it was made by the Third Circuit en banc, and quite recently.

Even allowing him the benefit of the *Davidson* dicta, Getch has failed to establish sufficient evidence from which to show that Rafferty had the requisite state of mind before March 1, 1985 in failing to initiate Getch's transfer from Rahway State Prison to Middlesex County Jail. Getch alleges that Rafferty knew of Getch's situation before March 1, 1985. As evidence of this, Getch can cite only his recollection that he contacted a few corrections officers and told other inmates of his situation. Rafferty's liability may not, however, be based on imputed knowledge nor on the doctrine of respondeat superior. *Hampton v. Holmesburg Prison Officials,* 546 F.2d 1077, 1082 (3d Cir.1976). At his second deposition, Getch admitted that he never used any official prison grievance procedures nor did he ever contact Rafferty directly. Getch claims that he wrote to

---

**25.** Defendant's Memorandum of Law, Exhibit R.

**26.** As noted in *supra* note 1, Getch's claim against his public defender was previously dismissed on the ground that under *Polk County v. Dodson,* 454 U.S. 312, 324–25, 102 S.Ct. 445, 453, 70 L.Ed.2d 509 (1981), a public defender does not act under color of state law within the meaning of § 1983. The Court takes no position on the culpability of the public defender nor on the possibility that he would have been held liable in an action for malpractice under state tort law. *Cf. Polk County,* 454 U.S. at 325, 102 S.Ct. at 453.

**27.** Two judges declined to join the majority of the en banc Third Circuit in its dicta on the ground that the court was not presented with any issue of gross negligence. *See* 752 F.2d at 828 n. 8; *see also Sourbeer v. Robinson,* 791 F.2d 1094, 1104 n. 9 (3d Cir.1986), *cert. denied,* —— U.S. ——, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987).

The Supreme Court in *Davidson,* though not reaching the issue, did not disturb the Third Circuit's dicta.

Rafferty at some unspecified time before March 1, 1985. Significantly, however, Rafferty denies receiving any such letter prior to March 1, 1985 and Getch has been unable on his own or through discovery to produce the elusive letter or any evidence of it. The opponent of a summary judgment motion may not defeat the motion merely by alleging that a particular factual issue is genuinely in dispute. Rather, the opponent must present sufficient evidence from which a reasonable jury could find for the opponent on the allegedly disputed factual issue. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Getch has failed to present sufficient evidence from which a reasonable jury could conclude that Rafferty knew of Getch's predicament before March 1, 1985. There is thus no genuine issue of material fact as to when Rafferty became apprised of Getch's situation; as a matter of law, Rafferty did not know of Getch's predicament until March 1, 1985.

Once reaching this conclusion, it follows quickly that Getch has failed to produce sufficient evidence from which a reasonable jury could conclude that Rafferty acted intentionally, with reckless indifference, or with gross negligence prior to March 1, 1985. At most Getch has established sufficient evidence from which a jury reasonably could find Rafferty guilty of negligence. *See, e.g., Hampton,* 546 F.2d at 1081. As already noted, however, negligence is not actionable for violations of the Due Process Clause under § 1983.

■ For the period from March 1, 1985 to May 14, 1985, on the other hand, Getch has satisfied the state-of-mind requirement. This is not because he has established intent, reckless indifference, gross negligence or even negligence on the part of Rafferty. Rather, it is because under the Third Circuit's opinion in *Sourbeer v. Robinson,* 791 F.2d 1094 (3d Cir.1986), *cert. denied,* — U.S. —, 107 S.Ct. 3276, 97 L.Ed.2d 779 (1987), no such showing need be made for the period after March 1, 1985,

during which Rafferty admits knowledge of Getch's status as a pretrial detainee. In *Sourbeer,* the Third Circuit addressed the issue of whether defendant prison officials had acted with the requisite state of mind in confining a prisoner in punitive detention without due process of law. The court distinguished *Daniels* and *Davidson* on the ground that these cases

> relate only to the highly unusual circumstance where the *deprivation* of life, liberty, or property ... was not intentional, as opposed to where the failure to provide adequate process was not intentional.... These cases ... are of a highly unusual nature—the defendants had probably not even been aware until after the fact of the "deprivations" that would trigger due process concerns....
>
> Here, in contrast, the keeping of Sourbeer in administrative custody—depriving him of liberty—was itself an intentional act. That being the case, it [is] not necessary ... to make any other state of mind finding.

*Id.* at 1104–05 (emphasis in original). Under *Sourbeer,* once Rafferty became aware of Getch's status as a pretrial detainee, Rafferty acted with the requisite state of mind in continuing to confine Getch at Rahway State Prison.[28]

(E) *Due Process*

The above discussion indicates that if (contrary to the Court's holding herein) Getch had a liberty interest and Rafferty violated it, Rafferty would have acted with the requisite state of mind after March 1, 1985. In that event it would become necessary to determine whether Getch received the process to which he was entitled under the Due Process Clause. All the evidence submitted thus far indicates that Rafferty, upon learning of Getch's situation on March 1, 1985, took swift action to effect Getch's release, even while noting that he had no duty to do so. The very day he learned of Getch's plight, Rafferty wrote to defendant Rosenbach to seek his assistance in obtaining a court order to transfer

---

**28.** Note that *Sourbeer* is inapplicable to the period before March 1, 1985 because, in the words of the *Sourbeer* court, Rafferty during that period was "not even ... aware until after the fact of the 'deprivations' that would trigger due process concerns." 791 F.2d at 1105.

Getch. On March 14, 1985, having still not received a court order authorizing Getch's release, Rafferty directed Senior Classification Officer Sherrer to seek further assistance from an executive assistant within the Department of Corrections. On March 22, the Department of Corrections responded with a recommendation that Rafferty contact the Clerk of the Appellate Division to obtain official notification of the court's reversal of Getch's conviction and to procure a court order authorizing Getch's release. Rafferty did exactly this twelve days later, on April 3, 1985. The next day, interestingly, Getch's own attorney finally filed a motion with Judge Nicola, the sentencing judge, requesting an order authorizing Getch's transfer. Judge Nicola did not sign this order until May 1, and Rafferty did not receive the order until May 14. Rafferty released Getch to Middlesex County Jail that same day.

Clearly, Rafferty acted in an entirely proper manner and with sufficient speed to secure Getch's transfer once he became aware of the reversal of Getch's conviction on March 1, 1985. Thus Getch received all the process to which he was entitled under the Due Process Clause.

### (F) *Qualified Immunity*

Even if Getch had a liberty interest, and even if Rafferty violated it without due process of law, the Court further concludes that Rafferty is entitled to summary judgment under the doctrine of qualified immunity.

■■■ Qualified or "good faith" immunity is available as an affirmative defense to government officials who are sued in the performance of discretionary governmental functions. *Harlow v. Fitzgerald*, 457 U.S. 800, 807–15, 102 S.Ct. 2727, 2732–36, 73 L.Ed.2d 396 (1982). Although at one time a defendant had to establish both objective and subjective good faith,[29] the Supreme Court in *Harlow* eliminated the subjective

element of the defense because this element had proven "incompatible with [its] admonition ... that insubstantial claims should not proceed to trial." 457 U.S. at 815–16, 102 S.Ct. at 2736–37. The *Harlow* Court held:

> [B]are allegations of malice should not suffice to subject government officials either to the costs of trial or to the burdens of broad-reaching discovery. We therefore hold that government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.
>
> Reliance on the objective reasonableness of an official's conduct, as measured by reference to clearly established law, should avoid excessive disruption of government and permit the resolution of many insubstantial claims on summary judgment. On summary judgment, the judge appropriately may determine, not only the currently applicable law, but whether that law was clearly established at the time an action occurred. If the law at that time was not clearly established, an official could not reasonably be expected to anticipate subsequent legal developments, nor could he fairly be said to "know" that the law forbade conduct not previously identified as unlawful.... If the law was clearly established, the immunity defense ordinarily should fail, since a reasonably competent public official should know the law governing his conduct.

457 U.S. at 817–19, 102 S.Ct. at 2738 (citations and footnotes omitted). After *Harlow*, a government official whose actions were objectively reasonable may prevail on summary judgment notwithstanding any allegations or evidence of subjective bad faith. *Forsyth v. Kleindienst*, 729 F.2d 267, 273 (3d Cir.1984).[30] Of course, the

---

**29.** The Supreme Court established the two-prong test in *Scheuer v. Rhodes*, 416 U.S. 232, 247–48, 94 S.Ct. 1683, 1692, 40 L.Ed.2d 90 (1974) and *Wood v. Strickland*, 420 U.S. 308, 321–22, 95 S.Ct. 992, 1000–01, 43 L.Ed.2d 214 (1975).

**30.** Conversely, an official's subjective good faith no longer gives rise to a defense of qualified immunity if the court finds his conduct to be objectively unreasonable in that it violated clearly established law. *Davis v. Scherer*, 468

determination whether an official's conduct violated clearly established law—that is, whether the conduct was objectively reasonable—is purely a question of law. *Czurlianis v. Albanese,* 721 F.2d 98, 108 (3d Cir.1983); *Skevofilax v. Quigley,* 586 F.Supp. 532, 539 (D.N.J.1984); *Hauptmann v. Wilentz,* 570 F.Supp. 351, 371 (D.N.J.1983), *aff'd without opinion,* 770 F.2d 1070 (3d Cir.1985), *cert. denied,* 474 U.S. 1103, 106 S.Ct. 887, 88 L.Ed.2d 922 (1986). Applying these principles, the Court determines as a matter of law that Rafferty's conduct did not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."

The Supreme Court in *Harlow* provided little guidance to trial courts for making the determination of whether rights were "clearly established" at the time of their alleged violation; the Court simply noted that its opinions, as well as those of the Courts of Appeals and of the local District Court, would have to be evaluated to ascertain the state of the law. *See* 457 U.S. at 818 n. 32, 102 S.Ct. at 2738 n. 32; *see also Procunier v. Navarette,* 434 U.S. 555, 564–65, 98 S.Ct. 855, 861, 55 L.Ed.2d 24 (1978). The Third Circuit has noted two ambiguities: first, whether a split in the case law precludes a finding that the law was "clearly established"; second, "how close a factual correspondence is required between applicable precedents and the case at issue." *People of Three Mile Island v. Nuclear Regulatory Commissioners,* 747 F.2d 139, 144 (3d Cir.1984). Although lower courts have resolved these ambiguities in different ways,[31] the Third Circuit in *People of Three Mile Island* held that officials must apply "general, well developed legal principles" and that there must be "some but not precise factual correspondence." *Id.*

In arguing against a finding of qualified immunity, Getch places undue emphasis on the question whether Rafferty should have known of the *existence* of Executive Order 106. The Court agrees with Getch that as a matter of law Rafferty should have known of the Order's existence. Indeed, Rafferty does not dispute this. What Rafferty could not have known, however, is the *extent of his duties* under the Executive Order, assuming his duties are as extensive as Getch would have this Court hold. That is, even if the Court is erroneous in its determination that Rafferty had no duty to effectuate any liberty interest that Getch may have had under the Order, Rafferty's failure to perform any such duty would not have violated any *clearly established* right attaching to Getch.

Throughout the time of Rafferty's actions or inactions herein, there was no case law closely enough on point to alert Rafferty of any rights of Getch's that he may have violated. The New Jersey Supreme Court had upheld Executive Order 106 as constitutional in *Worthington v. Fauver,* 88 N.J. 183, 440 A.2d 1128 (1982). The Third Circuit had applied the Executive Order in *Union County Jail Inmates v. Di Buono,* 713 F.2d 984 (3d Cir.1983), *cert. denied,* 465 U.S. 1102, 104 S.Ct. 1600, 80 L.Ed.2d 130 (1984). But neither of these cases, nor any other case of which the Court is aware, had determined whether the Executive Order created a liberty interest in pretrial detainees; whether any such interest would apply to a person who acquired the status of pretrial detainee after being committed to the custody of the commissioner; or whether a state prison superintendent had any duty to effectuate a prisoner's release under the Executive Order. Nor is the Court aware of any analogous cases from other jurisdictions applying or interpreting a similar provision in another

---

U.S. 183, 191, 104 S.Ct. 3012, 3017, 82 L.Ed.2d 139 (1984) ("No other 'circumstances' are relevant to the issue of qualified immunity."); *People of Three Mile Island v. Nuclear Regulatory Commissioners,* 747 F.2d 139, 144 (3d Cir.1984) ("No other inquiry is relevant."); *see also Skevofilax v. Quigley,* 586 F.Supp. 532, 539–42 (D.N.J. 1984). Of course, an official's state of mind is still relevant to whether there has been a *viola-*

tion of any rights in the first instance. *See* Part I(D), *supra.*

**31.** *See People of Three Mile Island,* 747 F.2d at 144; Comment, Harlow v. Fitzgerald: *The Lower Courts Implement the New Standard for Qualified Immunity Under Section 1983,* 132 U.Pa.L. Rev. 901, 923–32 (discussing three different approaches taken by lower courts).

state's statutes, executive orders, or administrative regulations.

Compounding the problem of a paucity of case law are the ambiguities of the Executive Order itself. As noted in Part I(B), *supra*, ¶ 8 of the Order is not a paragon of clarity. One clause in the paragraph speaks of pretrial detainees; the next clause refers to persons "committed to the custody of the Commissioner." Although it is possible that the Governor was using these terms as opposites, it is even more probable that he envisioned some overlap, as noted in Part I(B). Since the Court itself has experienced some difficulty ascertaining the import of ¶ 8, Rafferty cannot be expected to have divined its meaning.[32]

Rafferty found himself in a position similar to that of the defendant Nuclear Regulatory Commissioners in *People of Three Mile Island, supra*, who issued an order modifying a nuclear operating license without holding a hearing. Although subsequent litigation resulted in a ruling that the Commissioners should have held a hearing, the Third Circuit held that defendants were entitled to qualified immunity from suit because the requirement of a hearing was not clearly established at the time of the Commissioners' actions. 747 F.2d at 147–49. Noting that the applicable statute was not clear on its face, the Third Circuit placed particular emphasis on the lack of judicial opinions on the subject. *See id.* at 148 & 149. In arguing that his putative rights were clearly established, Getch focuses on the text of the Order alone and ridicules the importance of Rafferty's assertion that there were no judicial opinions interpreting the Order in a similar factual context at the time in question. In so doing, Getch misconstrues the meaning of "clearly established rights." As noted above, since introducing the objective prong of qualified immunity in *Procunier*, and singling it out in *Harlow*, the Supreme Court has always assumed that the state of

the law would be evaluated with reference to judicial opinions. The only debated issues have been (1) the effect of conflicting legal authority and (2) how closely on point the relevant judicial opinions must be. In the instant case, Getch has not cited a single judicial opinion even arguably on point before the prior determination by Judge Sarokin in this case, which was, of course, issued after the events in question herein. Getch relies solely on the words of the Order as if it were a talisman. Not having had the benefit of case law from which to glean the amulet's elusive meaning, however, Rafferty is immune from its effect.

In sum, upon learning of Getch's situation, Rafferty was presented with a novel problem for which he could not find adequate guidance in case law or other legal authority. It was precisely to protect officials like Rafferty in such situations that the Supreme Court developed the doctrine of qualified immunity in the first place. "[W]here an official's duties legitimately require action in which clearly established rights are not implicated, the public interest may be better served by action taken 'with independence and without fear of consequences.'" *Harlow*, 457 U.S. at 819, 102 S.Ct. at 2739 (quoting *Pierson v. Ray*, 386 U.S. 547, 554, 87 S.Ct. 1213, 1217, 18 L.Ed. 2d 288 (1967)).

## II. *Injury to Getch During His Confinement at Rahway*

■ Getch's second cause of action against defendant Rafferty is for the latter's failure to protect Getch from injuries he sustained on March 17, 1985 as a result of an altercation with another inmate. Following publication of the March 10 *Star–Ledger* article, Getch alleges, Rafferty knew or should have known of the imminency of harm to Getch. Rafferty has moved for summary judgment on this second count of the complaint as well.

---

**32.** As for Rafferty's duty to "cooperate" under the Executive Order, the Court determines that, to the extent (contrary to the Court's holding herein) that this duty may encompass a duty to notify the Commissioner of Getch's situation, that duty was not "clearly established" at the time in question. The Court reaches this conclusion for the same reasons that the Court finds no clearly established rights under the Executive Order in general.

The Court notes initially that Getch has alleged a valid liberty interest under the Fourteenth Amendment in being free from attack by other inmates. The Supreme Court has held that "the right to personal security constitutes a 'historic liberty interest' protected substantively by the Due Process Clause. And that right is not extinguished by lawful confinement...." *Youngberg v. Romeo*, 457 U.S. 307, 315, 102 S.Ct. 2452, 2458, 73 L.Ed.2d 28 (1982) (citation omitted).

The principal argument advanced by Rafferty in support of his motion for summary judgment on this count is Getch's inability to prove the requisite state of mind.[33] As discussed in Part I(D), *supra*, the Supreme Court has held that only intentional conduct can "deprive" a person of rights under the Due Process Clause of the Fourteenth Amendment; negligent conduct does not amount to a violation. *Daniels*, 474 U.S. at 330–31, 106 S.Ct. at 665–66; *Davidson v. Cannon*, 474 U.S. at 347, 106 S.Ct. at 670–71. Rafferty argues that Getch has failed to proffer sufficient evidence from which a reasonable jury could find that Rafferty intentionally subjected Getch to the injuries caused by Getch's fight with the other inmate. The Court agrees.

Getch's cause of action sounds in negligence. The second count of the complaint alleges a breach of the duty of care on the part of Rafferty. *See* Amended Complaint ¶ 27. The only reference to any conduct beyond negligence is an allegation that Rafferty acted with "deliberate indifference" to plaintiff's safety. *Id.* ¶ 28. At best Getch appears to be alleging a state of mind somewhere between negligence and intentional conduct. Notably, the Supreme Court in *Daniels* declined to decide whether such intermediate states of mind can violate the Due Process Clause. *See* 474 U.S. at 334 n. 3, 106 S.Ct. at 667 n. 3. However, as already discussed in *supra* Part I(D), the Third Circuit has apparently resolved this issue in Getch's favor in its opinion in *Davidson*, which was affirmed by the Supreme Court. *See Davidson*, 752

F.2d at 828. Nevertheless, Rafferty is entitled to summary judgment on Count II because Getch has failed to meet his burden of production in opposition to Rafferty's motion.

As noted above, a litigant may not survive a motion for summary judgment merely by alleging that there is a genuine issue of material fact; rather, the opponent of a summary judgment motion must come forth with sufficient evidence from which a reasonable factfinder could resolve the issue in his favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). In opposing this motion, Getch has failed to present sufficient evidence from which a reasonable jury could find that Rafferty acted with deliberate indifference. Getch has established that an article appeared in the *Star–Ledger* on March 10, 1985 describing Getch's plight. He has alleged that the publicity surrounding the article's publication led other inmates to "scorn" him, and led ultimately to his injuries. *See* Amended Complaint ¶ 25. Getch alleges that Rafferty "knew or should have known that Getch was in imminent danger of harm after his situation was published" since "it is a well-known fact that inmates who are about to be released are potential victims of assault and robbery." Plaintiff's Opposition Memorandum, at 20–21. With regard to the latter hypothesis, the Court notes that even if it were true, it would not be applicable since the *Star–Ledger* article merely reported Getch's situation and his attempts to be transferred; it did not report that his release was imminent (as indeed it was not). Moreover, Rafferty disputes the assertion that the publicized imminency of a prisoner's release subjects him to potential attack by fellow inmates. Of course, such conflicting theories give rise to a jury question, but only as to negligence. Getch's allegations are insufficient as a matter of law to prove "deliberate indifference" or intentional deprivation.

**33.** Rafferty also argues that Getch has failed to present sufficient evidence that Rafferty even knew of the article's publication. As will be-

come apparent below, *see* text accompanying *infra* note 36, the Court need not decide this issue.

The Supreme Court's opinion in *Davidson* directly supports this conclusion, since the facts in that case were similar to those in the instant case and even more favorable to plaintiff there. In *Davidson*, a prisoner wrote a note to the assistant superintendent of the prison (one Cannon), reporting that another inmate had threatened to harm him. Cannon read the note, but did not think the situation urgent since the prisoner had not contacted him directly. Cannon then sent the note to a corrections sergeant (one James), who left the note on his desk unread. Two days later, the prisoner was seriously wounded in an attack by the other inmate. 474 U.S. at 345–46, 106 S.Ct. at 669. Though not disturbing the trial court's ruling that defendants had been negligent, the Supreme Court held that the conduct of the two prison officials, as a matter of law, did not violate the Due Process Clause of the Fourteenth Amendment. *Id.* at 347–48, 106 S.Ct. at 670. The Court held:

> Respondents' lack of due care in this case led to serious injury, but that lack of care simply does not approach the sort of abusive government conduct that the Due Process Clause was designed to prevent. Far from abusing governmental power, or employing it as an instrument of oppression, respondent Cannon mistakenly believed that the situation was not particularly serious, and respondent James simply forgot about the note. The guarantee of due process has never been understood to mean that the State must guarantee due care on the part of its officials.

*Id.*[34]

*Davidson* is quite similar factually to the case at bar. The note to prison officials in

*Davidson* is analogous to the *Star–Ledger* article here.[35] Cannon represents Rafferty if he knew of the article; James represents Rafferty if he did not. Either way, Rafferty's conduct, as a matter of law, could not have amounted to more than negligence.[36] Therefore Getch has failed to proffer sufficient evidence to prove that Rafferty "deprived" him of his Fourteenth Amendment liberty interests, and his cause of action must fail.

### III. *Getch's Classification at Rahway*

In his third cause of action against defendant Rafferty, Getch alleges that Rafferty violated his liberty interests by placing and keeping Getch in closed custody confinement during two separate periods: March 17, 1985 to May 14, 1985; and September 16, 1985 to October 29, 1985. Getch alleges that Rafferty's acts were knowing, intentional and malicious. Rafferty responds that he had valid reasons for so detaining Getch throughout both periods.

The liberty interests of which Getch alleges he was deprived are those arising under the Due Process Clause of the Fourteenth Amendment and under the Eighth Amendment. In *Hewitt v. Helms*, 459 U.S. 460, 103 S.Ct. 864, 74 L.Ed.2d 675 (1983), the Supreme Court held that a prisoner does not have a liberty interest in being confined among the general population of the prison, rather than the admittedly "austere and restrictive" quarters of closed custody confinement. *Id.* at 466–67, 103 S.Ct. at 869. There, as here, closed custody confinement[37] subsumed several different cus-

---

**34.** As examples of cases of intentional conduct by prison officials, the Supreme Court cited *Johnson v. Glick*, 481 F.2d 1028 (2d Cir.), *cert. denied*, 414 U.S. 1033, 94 S.Ct. 462, 38 L.Ed.2d 324 (1973) (where the prison guards themselves attacked and injured a prisoner) and *Curtis v. Everette*, 489 F.2d 516 (3d Cir.1973), *cert. denied*, 416 U.S. 995, 94 S.Ct. 2409, 40 L.Ed.2d 774 (1974) (where prison officials stood by and allowed an attack on a prisoner to proceed).

**35.** This analogy would work, of course, only if the jury accepted Getch's theory that prison officials should have known that publication of the article put Getch's safety in jeopardy.

**36.** Thus the Court concluded, *supra* note 33, that it is unnecessary to determine whether Rafferty knew of the article's publication.

**37.** The terminology was, however, different. In *Hewitt* the catchall phrase was "administrative segregation"; in the case at bar, the catchall phrase is "closed custody confinement," while "administrative segregation" denotes confinement for punitive purposes. *Compare Hewitt*, 459 U.S. at 468, 103 S.Ct. at 869–70 *with* Certification of Lydell Sherrer, March 24, 1988 [hereinafter Sherrer Certification I] ¶¶ 8–13.

todial purposes: to protect the inmate's safety, to protect other inmates from the inmate, to break up groups of potentially disruptive inmates, or simply to await further classification or transfer. *Id.* at 468, 103 S.Ct. at 869–70. The Court held:

> It is plain that the transfer of an inmate to less amenable and more restrictive quarters for nonpunitive reasons is well within the terms of confinement ordinarily contemplated by a prison sentence.... Accordingly, [closed custody confinement] is the sort of confinement that inmates should reasonably anticipate receiving at some point in their incarceration.[38]

As discussed in Parts I(D) and II, *supra,* the Supreme Court has held that only intentional deprivations of constitutional rights can violate the Due Process Clause of the Fourteenth Amendment and thus give rise to liability under 42 U.S.C. § 1983. *Daniels,* 474 U.S. at 330–31, 106 S.Ct. at 665–66; *Davidson v. Cannon,* 474 U.S. at 347, 106 S.Ct. at 670–71. In the wake of *Daniels* and *Davidson,* as already noted, the Third Circuit gave a liberal interpretation to intent as it applies to keeping an inmate in administrative custody. *Sourbeer,* 791 F.2d at 1105. The court in *Sourbeer* held that the mere keeping of an inmate in administrative custody is an intentional act and deprives the inmate of liberty. *Id.* Under *Sourbeer,* Getch has established the requisite state of mind with respect to Count III of his complaint.

As noted by defendant in the instant case, Getch was placed in closed custody confinement for different purposes during different times. Accordingly, the Court must examine each period of Getch's closed custody confinement in order to determine whether he had a liberty interest during that period, and eventually to determine whether he was given all the process to which he was entitled.

■ Getch was originally placed in closed custody confinement on March 17, 1985, the day he was involved in the fight with fellow inmate Coker. From that date until March 20, 1985, there were two reasons for Getch's closed custody confinement: pre-hearing detention preceding an administrative hearing on charges stemming from the fight with Coker; and protective custody to protect Getch from Coker and "Coker's boys."[39] Under *Hewitt,* because this confinement was nonpunitive in purpose, it did not implicate any liberty interest of Getch's. A mere three days later, on March 20, 1985, Getch was given a hearing on the disciplinary charge. At the hearing, Getch admitted his guilt to the charges (fighting with another inmate, namely, Coker), but explained that he was justified in starting the fight because Coker had stolen cigarettes from him. Getch received ten days lockup time for his violation of the disciplinary rule prohibiting inmate fighting.[40] With credit for the three days already served, Getch was confined in administrative segregation for punitive purposes until March 27, 1985. It is important to note that at the hearing on the disciplinary charge, Getch was allowed to be heard and was represented by an "inmate substitute."[41] Thus Getch received the process to which he was entitled before being confined for punitive purposes from March 20, 1985 to March 27, 1985.

■ As noted, Getch remained in closed custody confinement after March 27th and until May 14, 1985, when he was transferred from Rahway State Prison. His confinement during that period, however, was not for punitive purposes. Rather, it was for protective custody. Ironically, the inmate himself requested to be held in pro-

---

**38.** Despite its holding that a prisoner has no liberty interest arising under the Due Process Clause in being free from administrative segregation, the *Hewitt* court went on to hold that the prisoner did have a liberty interest arising from Pennsylvania statutes and regulations governing the operation of the state prison system. *Id.* at 469–72, 103 S.Ct. at 870–71. Plaintiff Getch has not cited any comparable statutes or regulations of New Jersey's, and thus appears to be relying exclusively on the Due Process Clause for his alleged liberty interest.

**39.** Sherrer Certification I, *supra,* ¶¶ 8, 14.

**40.** *Id.* at ¶ 4; *id.* Exhibit C.

**41.** *Id.* ¶ 6; *id.* Exhibit D.

tective custody for the duration of his incarceration at Rahway. That request came at a March 28, 1985 administrative hearing concerning Getch's continued protective custody status. Waiving the procedural rights to which he was entitled at that hearing, Getch told Hearing Officer Vito Casarella that he wanted to remain in protective custody because of the danger that he perceived from Coker and "Coker's boys." [42] From March 28 to May 14, 1985, therefore, Getch was in protective custody voluntarily. His confinement there was for protective rather than punitive purposes. Even though Getch had no liberty interest in being free from such confinement, to the extent that he did, he waived it; alternatively, he received all the process to which he was entitled.

 Upon his return to Rahway State Prison on September 16, 1985, Getch was once again placed in closed custody confinement. According to defendant Rafferty, Getch received this classification because it was the classification that he had been in upon leaving Rahway; to protect Getch from any possible continuing threat, prudence required that he be placed in protective custody until a hearing could be held to determine whether any threat to his safety remained. [43] Nine days later, on September 25, 1985, an interoffice memorandum concluded that protective custody for Getch was no longer necessary because inmate Coker was no longer being held in Rahway State Prison. [44] Not until October 29, 1985 was Getch finally released from protective custody and placed in the general prison population. [45]

Rafferty offers a sketchy explanation for why it took from September 25, the date of the internal prison memorandum, to October 29, to release plaintiff Getch from protective custody. The only justification that

Rafferty can offer for this delay is that the September 25 memorandum did not address the location and status of the other inmates known as "Coker's boys." Rafferty explains that further "administrative consideration" was required to ascertain their status and whether they posed a threat to Getch. [46] As in *Sourbeer*, 791 F.2d at 1100, the Court determines that, although it is a close question, this delay did not rise to the level of a due process violation. In light of the events underlying Count II of Getch's complaint, in which Getch alleges that Rafferty failed to take adequate measures to protect him from another inmate, it was certainly preferable that Getch be confined in protective custody for too long rather than too short a time period. *See also Mims v. Shapp*, 744 F.2d 946, 954 (3d Cir.1984).

In sum, it is only in the period from March 20 to March 27, 1985, that Getch had a liberty interest in not being confined in closed custody confinement, because it is only during that period that his detention was for punitive purposes. *See Hewitt, supra.* For the other periods in question, Getch's closed custody confinement implicated no liberty interests because he was not being held for punitive purposes, but rather for protective purposes. *Id.* Even if Getch did have a liberty interest during those other periods, his Fourteenth Amendment rights were not violated because he received all the process to which he was entitled.

## IV. *Alleged Pattern of Gross and Willful Neglect*

In Count IV of his amended complaint, plaintiff Getch alleges that defendant Rafferty is guilty of a "pattern of gross and willful neglect." In light of the Court's

---

**42.** *Id.* ¶ 16; *id.* Exhibit I. In his affidavit in opposition to the instant motion, Getch denies that he ever requested to be placed or kept in closed custody confinement for protective or any other purposes. Getch Affidavit, *supra,* ¶ 12. Getch's mere self-serving denial of an authentic prison document based on his "recollection" is insufficient, however, to place the information contained in the document genu-

inely at issue. *Cf. Anderson,* 477 U.S. at 248, 106 S.Ct. at 2511.

**43.** Sherrer Certification I, *supra,* ¶ 19.

**44.** *Id.; id.* Exhibit K.

**45.** *Id.; id.* Exhibit J.

**46.** *Id.* ¶ 19.

rulings on the first three counts of Getch's complaint, this cause of action must fail.

## V. *Eighth Amendment Claims*

 In each of the four counts of his amended complaint, Getch alleges a violation of his Eighth Amendment rights to be free of cruel and unusual punishment. With respect to Count I of his complaint, Getch has cited no authority for the proposition that incarceration of a pretrial detainee in a state prison rather than a county jail amounts to cruel and unusual punishment. Although the Eighth Amendment "proscribes more than physically barbarous punishments," the Amendment extends only so far as to prohibit the "unnecessary and wanton infliction of pain" and in general any conduct that is "incompatible with 'the evolving standards of decency that mark the progress of a maturing society.'" *Estelle v. Gamble*, 429 U.S. 97, 102–03, 97 S.Ct. 285, 290, 50 L.Ed.2d 251 (1976) (quoting *Trop v. Dulles*, 356 U.S. 86, 101, 78 S.Ct. 590, 598, 2 L.Ed.2d 630 (1958)). The incarceration of a pretrial detainee in a state prison simply does not amount to cruel and unusual punishment. As already noted, there may have been a slightly greater danger of injury in a state institution than in a county jail, but this difference was only slight. Moreover, state prisons are arguably more desirable places of incarceration than county jails in that they generally have superior educational, recreational and rehabilitative facilities. It would serve only to trivialize the importance of the Eighth Amendment to hold that it is implicated under these facts. *Cf. Daniels*, 474 U.S. at 332, 106 S.Ct. at 665 (prohibiting the Due Process Clause from being similarly trivialized).

With respect to Count II of Getch's complaint, the Eighth Amendment is implicated since subjecting a prisoner to violence by other prisoners can amount to cruel and unusual punishment. *E.g., Little v. Walker*, 552 F.2d 193, 197 (7th Cir.1977), *cert. denied*, 435 U.S. 932, 98 S.Ct. 1507, 55 L.Ed.2d 530 (1978); *Scittarelli v. Manson*, 447 F.Supp. 279, 284 (D.Conn.1978). However, there can only be an Eighth Amendment *violation* if the prisoner was so subjected either intentionally or as a result of "deliberate indifference." *See Estelle*, 429 U.S. at 105–06, 97 S.Ct. at 292; *Little*, 552 F.2d at 197; *Scittarelli*, 447 F.Supp. at 284. As already discussed in *supra* Part II, there was no intent nor deliberate indifference as a matter of law.

As for Count III, the Eighth Amendment is not implicated by the holding of a prisoner in protective custody simply because such a measure is nonpunitive by definition. If it is not punishment, it cannot amount to cruel and unusual punishment. *Cf. Hutto v. Finney*, 437 U.S. 678, 685, 98 S.Ct. 2565, 2570–71, 57 L.Ed.2d 522 (1978).

Finally, there is no valid Eighth Amendment claim under Count IV since that cause of action is merely a conglomeration of three claims wherein there have been no Eighth Amendment violations.

## CONCLUSION

For the reasons set forth above, defendant Rafferty's motion for summary judgment is granted in its entirety.